| | |
|---|---|
| JOANNE M. MILLAY, *as parent of*<br>*minor child Y.M.*,<br><br>　　　　Plaintiff<br><br>　　v.<br><br>SURRY SCHOOL DEPARTMENT,<br><br>　　　　Defendant | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

1:09-cv-411-JAW

## RECOMMENDED DECISION

This civil action arises under the Individuals with Disabilities Education Act, 20 U.S.C. §§ 1400-1487, and presents a petition by the mother of a disabled student, who seeks judicial review of a due process hearing decision presided over by Rebeka J. Smith, Esq. The question is whether the Surry School Department offered a free appropriate public education to the disabled student, Y.M., for the 2008-2009 school year, including an extended school year program offered in the summer of 2008 to transition Y.M. to a structured educational program. This dispute follows a related dispute pending in case number 1:07-cv-178, concerning the 2007-2008 school year. In the related proceeding, the Court found that Surry failed to have available a free appropriate public education for Y.M. at the start of the 2007-2008 school year. The issue of remedy for that failure remains pending. With respect to the instant dispute, the hearing officer determined that Surry developed an appropriate individual education program, made an appropriate placement decision in light of the demands of the program, and offered an appropriate extended school year program in the summer of 2008 to transition Y.M. back to school These determinations are before the Court on opposing briefs.

The Court referred the matter for report and recommendation pursuant to 28 U.S.C. §
636. For reasons that follow, I recommend that the Court uphold the hearing officer's
determination and enter judgment for the Surry School Department with regard to the 2008 ESY
and 2008-2009 school year programs.

## I.     INDIVIDUALS WITH DISABILITIES EDUCATION ACT

The Individuals with Disabilities Education Act (IDEA) is designed to ensure "a free
appropriate public education" to children with disabilities, one "that emphasizes special
education and related services designed to meet their unique needs and prepare them for further
education, employment, and independent living." 20 U.S.C. § 1400(d)(1)(A). To reach this
goal, Congress provides federal funding to the states, provided that the states implement specific
policies and procedures set forth in the IDEA. See id. § 1412(a). The general prerequisite to a
state's receipt of federal funds is the provision of a "free appropriate public education" in the
"least restrictive educational environment" to all disabled children residing within the state. Id.
§§ 1412(a)(1), (5). A free appropriate public education ("FAPE") consists of an educational
program "that emphasizes special education and related services designed to meet the[] unique
needs" of each child, id. § 1400(d)(1)(A), by affording "specially designed instruction, at no cost
to parents, to meet the unique needs of a child with a disability." Id. § 1401(29). By also
requiring that education and related services be provided in the least restrictive environment
("LRE"), Congress sought to ensure that children with disabilities are educated alongside non-
disabled students "[t]o the maximum extent appropriate," so that "special classes, separate
schooling, or other removal of children with disabilities from the regular educational
environment occurs only when the nature or severity of the disability of a child is such that
education in regular classes . . . cannot be achieved satisfactorily." Id. § 1412(a)(5)(A).

Pursuant to the IDEA, the unique needs of each child are to be set forth in an individualized educational program ("IEP") developed by a team of individuals, including the child's parents, the child's regular and special education teachers, a qualified representative of the local educational agency, various consulting experts and, where appropriate, the child.  20 U.S.C. § 1414(d).  In Maine, that team is commonly known as the Pupil Evaluation Team, Mr. I. v. Me. Sch. Admin. Dist. No. 55, 480 F.3d 1, 5 (1st Cir. 2007), but Surry generally refers to the team as the IEPT, another common moniker that is short for the individualized educational program team.  The IEP is a written statement that is developed, periodically reviewed (at least annually), and revised by the IEPT in accordance with specific procedures set forth in the IDEA.  20 U.S.C. § 1414(d)(3) & (4).

As for adequacy of programming, the IDEA "establishes a basic floor of education" for children with disabilities, guaranteeing them a FAPE, but it does not displace the states from their traditional role in setting educational policy.  Burlington v. Dep't of Educ., 736 F.2d 773, 788 (1st Cir. 1984).  Each state is free to calibrate its own educational standards, provided it does not set them below the minimum level prescribed by the IDEA.  Id. at 788-89.  The IDEA does not mandate provision of an ideal program.  Rather, a school system is expected only to provide an appropriate public education, one "reasonably calculated to enable the child to receive educational benefits."  Bd. of Educ. v. Rowley, 458 U.S. 176, 207 (1982).  This assures a "basic floor of opportunity," id. at 201;  a program offering "a reasonable probability of educational benefits with sufficient supportive services at public expense," G.D. v. Westmoreland Sch. Dist., 930 F.2d 942, 948 (1st Cir. 1991) (citing Rowley, 458 U.S. at 187-89).

## II.   BACKGROUND

This background statement is divided into four parts. Part A provides a summary description of the student, her disabilities, and her past programs and placements. Part B summarizes related case number 1:07-cv-178, which serves as a prologue to the instant case. Part C describes the IEPT meetings that underlie the instant case. Part D describes the due process decision and some of the testimonial evidence considered by the Hearing Officer.

### A.  Y.M. and past programming

Y.M. was born in November of 1993. She was born prematurely with a birth weight of two pounds. She was blind from birth with bilateral cataracts, Vitamin A deficiency, and retinal detachments. She suffers moderate hearing loss but is not fully deaf based on her current receptive language skills and love for music. Joanne Millay adopted Y.M. from a Nicaraguan orphanage and brought her home to Surry, Maine. In the orphanage, Y.M. suffered malnutrition and was kept in a crib for most of her first three years. She has a seizure disorder that is controlled at present by medication. Y.M. began walking at age three and spoke her first words at age four. She is classified as both autistic and mentally retarded. (IX, 1944-45, 47.) Y.M. enrolled in the Surry School District in 1999 and participated in a general life skills program through the 2004-2005 school year.

For the 2005-2006 school year, Surry School District agreed to send Y.M. to the Perkins School for the Blind in Massachusetts, at Millay's request. At that time it was recognized by the IEPT, including Millay, that Y.M.'s best opportunity at achieving adaptive social and communicative progress would be in a residential program administered by experts in deaf-blind education who also had the requisite special education skills to educate autistic and mentally retarded children. Although Y.M. had spent the prior five or six years participating in a life

## II.   BACKGROUND

This background statement is divided into four parts. Part A provides a summary description of the student, her disabilities, and her past programs and placements. Part B summarizes related case number 1:07-cv-178, which serves as a prologue to the instant case. Part C describes the IEPT meetings that underlie the instant case. Part D describes the due process decision and some of the testimonial evidence considered by the Hearing Officer.

### A.  Y.M. and past programming

Y.M. was born in November of 1993. She was born prematurely with a birth weight of two pounds. She was blind from birth with bilateral cataracts, Vitamin A deficiency, and retinal detachments. She suffers moderate hearing loss but is not fully deaf based on her current receptive language skills and love for music. Joanne Millay adopted Y.M. from a Nicaraguan orphanage and brought her home to Surry, Maine. In the orphanage, Y.M. suffered malnutrition and was kept in a crib for most of her first three years. She has a seizure disorder that is controlled at present by medication. Y.M. began walking at age three and spoke her first words at age four. She is classified as both autistic and mentally retarded. (IX, 1944-45, 47.) Y.M. enrolled in the Surry School District in 1999 and participated in a general life skills program through the 2004-2005 school year.

For the 2005-2006 school year, Surry School District agreed to send Y.M. to the Perkins School for the Blind in Massachusetts, at Millay's request. At that time it was recognized by the IEPT, including Millay, that Y.M.'s best opportunity at achieving adaptive social and communicative progress would be in a residential program administered by experts in deaf-blind education who also had the requisite special education skills to educate autistic and mentally retarded children. Although Y.M. had spent the prior five or six years participating in a life

4

skills program in the Surry Elementary School, she made very little progress in that time. Millay and the other members of the IEPT recognized that Y.M. could achieve greater progress with a more intense, full-time program focused on her exceptional needs. Unfortunately, the residential placement did not succeed. Separation from home was overwhelming for Y.M., leading to self-injurious behaviors, including a period of anorexia that interfered with medications prescribed to control Y.M.'s seizure disorder. Y.M. spent much of the 2005-2006 school year regaining her health at home in Surry.

Y.M. returned to Surry Elementary in May of 2006, near the end of the school year. At that time she received a limited, one-hour program and a room assignment that fell far short of her prior participation in the life skills program. Ms. Millay withdrew Y.M. from the school but let her return to the premises in the summer for an ESY program administered by United Cerebral Palsy staff and a prospective special education teacher/education technician, Anita Gilley. This summer program was designed, in part, to facilitate the start of a new program at Surry Elementary for the 2006-2007 school year that would involve a new IEP designed to approximate certain features of the Perkins program. However, upon return to the school, special education supervisory staff at Surry Elementary directed Ms. Gilley to provide Y.M. with the IEP in place prior to the Perkins experiment. As it turned out, Y.M.'s IEPT had not met in a timely fashion to develop any Perkins-based IEP for the 2006-2007 school year. Although the old IEP was treated as the default IEP by Surry staff, the program that Surry implemented in this brief window of time was much more restrictive in terms of space and access to adaptive equipment than it had been in the past. Y.M.'s incidents of self-injurious behaviors escalated in this timeframe. Ms. Millay withdrew Y.M. from the program in late September 2006. Surry

denied Millay's request for an alternative placement and Y.M. remained out of school for the balance of the school year.

Based on these developments, Ms. Millay filed a complaint with the United States Department of Education, Office for Civil Rights. This resulted in an investigation by attorneys appointed by the Maine Department of Education, commenced in February 2007, who eventually authored a complaint investigation report, pursuant to 20-A M.R.S. § 7206. With the commencement of these proceedings, Surry retained counsel from the Law Firm of Drummond Woodsum & MacMahon to begin managing Y.M.'s case. Ms. Millay also retained counsel for a time.

The IEPT eventually met on June 12, 2007, and it was agreed that the IEP developed by Perkins would provide a starting point for a new IEP. Ms. Millay was seeking to have a modified Perkins program placed within the life skills program at Mount Desert Island High School. Special education personnel at Mount Desert Island High School demurred, maintaining that the parameters of Y.M.'s Perkins-based IEP were too unclear at the time and that such a program could not be adequately administered within their existing life skills program. The IEPT reconvened on June 21, 2007. Attorney Eric Herlan, counsel for Surry herein, facilitated the team meeting and, at the end of the meeting, Surry determined that a Perkins-based IEP would be developed and that Y.M. would be placed in a day treatment facility known as KidsPeace. Special education staff at Mount Desert Island High School reiterated the view that their life skills program would not be adequate to deliver such a program.

As of the June 21 meeting, no personnel from KidsPeace had ever participated in one of the IEPT meetings and Surry personnel and consultants charged with developing Y.M.'s IEP had presented exceedingly limited information about KidsPeace and its readiness to administer

Y.M.'s IEP.  Moreover, as of the June 21 meeting, the only assessment of KidsPeace offered by any consulting expert was to the effect that KidsPeace was not an appropriate placement. Finally, the IEP itself was still in a developing stage, though this was understood as something the consulting experts would iron out upon the start of Y.M.'s programming.

A few weeks later, on July 11, 2007, the complaint investigation report issued and was favorable to Ms. Millay and Y.M.  The MDOE ordered a corrective action plan that required Surry to implement the Perkins-styled program beginning in the summer of 2007 and ordered that the IEPT further develop Y.M.'s IEP with input from professionals at the Perkins School and other professionals with knowledge of Y.M. and her needs.   A Parental Notice of Proposed Special Education Change of Program form dated August 15, 2007, stated that placement at Mount Desert Island High School was "rejected because not sufficiently structured."  The IEPT reconvened on August 23, 2007, and Surry again determined that placement at KidsPeace was proper, still without any meaningful participation from KidsPeace or discussion of how the emerging IEP would be administered or who would oversee its development and refinement within that setting.

Ms. Millay refused to let Y.M. participate in the proposed KidsPeace program and petitioned the Maine Department of Education for a due process hearing on November 21, 2007, with Surry cross-petitioning on November 30, 2007.  The hearing commenced in January 2008 and the hearing officer issued a decision on June 20, 2008, finding that Surry's willingness to tuition Y.M. at Perkins was tantamount to providing a FAPE, without reaching the issue of the KidsPeace placement versus a public school placement.[1]

---

[1]      It appears likely that the hearing officer recognized that there was no local placement actually prepared to deliver services at the start of the 2007-2008 school year or even as late as the January 2008 hearing.

While the due process petition was pending before the hearing officer, Y.M. remained out of any school placement. Y.M.'s IEPT was active during the 2007-2008 school year, however, and the IEP and placement at issue in the instant case was largely developed in that timeframe, with considerable input from consulting experts. That development is set out below, in Part C.

Apart from IEP development, in September 2007 Surry hired a special education teacher, Rebecca York, to serve as Y.M.'s primary educator, along with another individual who was meant to serve as an additional education technician. As an alternative to placement in the day treatment milieu, Surry offered to continue Y.M.'s programming at Surry Elementary, with Ms. York and the education technician serving as Y.M.'s primary special education staff, and with consultative services offered on a contract basis. This is memorialized in a letter authored by Superintendent Boothby on October 22, 2007. (Admin. R., Vol. IX, at 2042.) The record suggests that Ms. Millay may have been open to this alternative, but that is not at all clear. On October 17, 2007, Ms. Millay permitted Y.M.'s day habilitation workers with United Cerebral Policy (UCP) to bring Y.M. to the school for a prearranged visit. Millay represents that the visit "evoked recollections of trauma, by [Y.M.'s] account," and was cut short with any further reintroduction to Surry Elementary being ruled out by Millay on that basis. (Id. 2031.) As for KidsPeace, Millay responded to Superintendent Boothby's letter and indicated that the KidsPeace placement jeopardized Y.M.'s safety and that Millay would only accept a placement in a public school life skills program within 40 miles. (Id. 2031-33.) The record reflects that an out-of-district public placement was explored with the Southern Penobscot Regional Program for Children with Exceptionalities (in Bangor but outside of the proposed 40 mile radius), but that admission was denied in December 2007. (Id. 1921.) Hancock County, where Y.M. resides, does not have a comparable regional program for special needs students.

### B. Case Number 1:07-cv-178

On November 27, 2007, Millay filed a civil action in this Court seeking injunctive relief in the form of a stay put order that would place Y.M. in the Mount Desert Island High School. After the hearing officer issued his decision in that case, the Court permitted Millay to amend her complaint in case 07-178 to request judicial review of the hearing officer's decision.

On October 28, 2008, the Court ordered that the appropriate stay put placement was Surry Elementary, because the status quo as of Millay's November filing was the placement ordered by MDOE in its July 2007 Complaint Investigation Report. (Order on Pending Mots. at 1, 3, 19-20, Case No. 1:07-cv-178, Doc. No. 53.)

On December 22, 2009, I issued a Recommended Decision on the parties' cross-motions for judgment on the administrative record, recommending that the Court reject the hearing officer's dismissal of Ms. Millay's plea for relief related to the spring of 2006 and the 2006-2007 school year and also recommending that the Court find a denial of FAPE during the 2007-2008 school year. (Rec. Dec. at 56-57, Case No. 1:07-cv-178, Doc. No. 137.)

In its Order dated April 21, 2010, the Court affirmed the Recommended Decision, vacated the dismissal of Millay's claim for denial of FAPE as of the spring of 2006 and continuing through the 2006-2007 school year, vacated the hearing officer's decision concerning the 2007-2008 school year, and found that the placement ordered by Surry in the 2007-2008 school year violated the IDEA, because the Surry School Department failed to have available a placement that could afford Y.M. a free appropriate public education at the beginning of the school year. (Order Affirming at 16, Case No. 1:07-cv-178, Doc. No. 157.) The Court further determined that the issue of remedy should be deferred based, in part, on the instant case, which

was pending as of the Court's Order, and the lack of adequate briefing on the issue of remedy.

(Id.)

### C.  Background for the Instant Dispute

The background to the present dispute concerning the 2008 ESY program and 2008-2009 school year picks up in October 2007, shortly before Y.M.'s fourteenth birthday.  On October 25, 2007, Dr. Royal Grueneich, Ph.D., issued an updated neuropsychological evaluation.  (Admin. R., Vol. IX, 1944-52.)  His findings include severe mental retardation and autistic disorder.  (Id. 1950.)  According to Dr. Grueneich, based on his prior evaluation in 2005:

> There was strong support for a diagnosis of autistic disorder in that she exhibited a variety of behavioral features which were not explicable solely on the basis of mental retardation, including anomalous communication and social skills, perseverative and ritualistic behaviors, and splinter skills (i.e., musical skills which were much more advanced than her general level of cognitive development).

(Id. 1947.)  Based on his 2007 observation of Y.M. and input from Ms. Millay, Dr. Grueneich assessed adaptive behavior skills in the severely impaired range (far below the first percentile), an average age equivalent of 22 months, and functioning markedly below average in communication, daily living, socialization, and motor skills, with age equivalents between 16 and 31 months.  (Id. 1948-49.)  Y.M.'s score on the Childhood Autism Rating Scale is consistent with functioning in the severely autistic range.  (Id. 1949.)  The Maladaptive Behavior section of the Vineland Adaptive Behavior Scales—Second Edition produced a clinically significant score higher than 98 percent of other children of equivalent age for internalization of emotional distress and mild elevation higher than 85 percent of other children for externalization of emotional distress.  Millay described Y.M. to Dr. Grueneich as "sometimes" being impulsive, having tantrums, and being physically aggressive, among other behaviors.  (Id. 1949.)  However,

Y.M. also demonstrated improved behavioral functioning in the home and community and an increased ability to tolerate frustration.  (Id. 1950.)  As for educational recommendations, Dr. Grueneich described Y.M.'s programming needs as substantial, with a need for intensive support services, a high level of direct staff support, speech therapy, occupational therapy, music therapy, physical therapy, blind consultation services, and psychological/behavioral consultation services. He noted a significant behavioral concern, a need for private space to retreat to, well trained and highly consistent staff, and a preference for long-term stability in staff and educational setting. He described Y.M. as vulnerable to reacting to behavioral pressure "by engaging in severe self-injurious behavior and intense emotional distress."  Behavioral intervention strategies were featured in his recommendation.  (Id. 1950-51.)  Dr. Grueneich referenced assessments by Elizabeth Dyer and Mary Talbot-Fox, Ph.D., concerning an additional need for a specialized communication program, including tactile and voice-generated augmentative equipment, administration of which would be significantly complicated by the behavioral concerns.  (Id. 1951-52.)  Dr. Grueneich indicated that non-academic mainstream activities with other students would also be needed in her program, without indicating a need for interaction with typically-developed children as opposed to other children with disabilities.  (Id. 1952.)

On November 4, 2007, Mark Hammond, M.A., Certificate of Clinical Competency-Speech-Language Pathology, issued an augmentative communication evaluation.  He assessed Y.M.'s existing communication skills and strategies, based both on observation and one or more interviews with Millay.  (Id. 1938-43.)  Mr. Hammond recommended that Y.M.'s teachers and support personnel utilize a Dictionary of Communicative Intent to catalog and help develop communicative exchanges with Y.M., a prompt hierarchy to assist with task completion, and other communicative strategies such as a consistent group of verbal directions, a symbol

exchange system, and one or more voice output devices.  Among other recommendations, Hammond opined that "a person skilled in Applied Behavioral Analysis (ABA) would be an asset to her team."  (Id. 1941.)  He felt that such a person "could very well assist in establishing the instructional protocols" needed to ensure a systematic approach to Y.M.'s programming.  (Id. 1941.)

Surry issued an IEP Notice on November 29, 2007, to schedule a meeting to begin planning for re-entry to a formal school program, though it does not appear that any meeting resulting from that particular notice was fruitful from a programming perspective.  (Id. 1924.) The month of January 2008 was largely occupied with proceedings in the prior due process hearing.  February was likely spent recuperating from that process.

### 1.  A behavioral scaffold

In March of 2008, while the prior due process decision was still to be issued, Melissa Beckwith, Director of Special Education for School Union 92 (which includes Surry), sent notice to the IEPT members seeking to schedule a team meeting for annual review of the IEP, further evaluations, and transition planning.  (Admin. R. Vol. VII, 1399-1401, 1406.)   Prior to the scheduled meeting in April 2008, Beckwith circulated a draft behavioral intervention and support plan authored by Dr. Tim Rogers for team member comment.  (Admin. R., Vol. VI, 1372-76.)

The primary focus of the plan was "to develop proactive and reactive strategies which will allow [Y.M.] to benefit from her educational program.  Specifically, a reduction in aggressive and self-abusive behaviors will likely improve [her] ability to benefit from her educational program."  (Id. 1372.)[2]  Central to this objective was the design of a transition schedule based on Y.M.'s demonstrated resistance to new programming.  He advised that this

---

[2]        This is the final report.  Whether the draft report in circulation in March is in the current record is not clear.

involved an "object schedule" to signify to Y.M. what new activities were approaching, a consistent daily schedule with concentration of preferred activities consistently scheduled to follow nonpreferred activities, and timed warnings in advance of program transitions. (Id. 1372-73.) Additional behavioral tools and devices are outlined in his report, with an object exchange system and frequent positive reinforcement in the absence of behavioral problems being strongly recommended. (Id. 1373-74.) In addition to these proactive approaches, the plan also outlines specific reactive approaches for addressing behavioral problems, including retreat to a known area of safety and comfort. (Id. 1374.) Specific guidelines for safety, meals, walking, prone behavior, and napping are also provided. (Id. 1375.) Dr. Rogers emphasized that Y.M.'s behavioral issues are ultimately a form of communication and that implementation and refinement of the techniques outlined in his report would lead to "significant reductions in aggressive and self-abusive behaviors." (Id. 1376.) Dr. Rogers specified that Y.M.'s program staff would have to collect data on various matters to adequately monitor and develop her behavioral plan, including incidents of positive reinforcement (recommended at no more than three-minute intervals) and "antecedent, behavior, and consequence" logs for any aggressive or self-abusive behavior, specifying the specific setting, persons present, and the activity at issue. (Id.)

On April 8, 2008, Dr. Talbot-Fox of Perkins e-mailed Beckwith her comments concerning Dr. Rogers's draft report. Dr. Talbot-Fox liked the plan, appears to have contributed to the development of the safe area specifications, reinforced certain of its protocols, and emphasized that reduction in the length of the school day should not be allowed due to Y.M.'s behavior, lest that behavior be reinforced unproductively. Dr. Talbot-Fox expressed concern about training for the program, stating that there are "some fairly sophisticated expectations,"

13

such that training would need to be good and that twice monthly consultative support noted in the extant IEP would need to be enhanced to at least once per week. (Admin. R., Vol. VII, 1391.) Dr. Talbot-Fox identified the plan as a "great starting point" and acknowledged that any behavioral plan would necessarily have to develop in the actual context of program delivery. Finally, she observed that the behavioral picture of Y.M. set out in the IEP seemed to draw too heavily on negative aspects of Y.M.'s behavior without mentioning positive signs of development in communicative and social skills outlined in Dr. Talbot-Fox's 2007 report of psychological evaluation. (Id. 1392.)

2. *April 9-10, 2008, IEP Team Meeting*

The IEPT met on April 9 and 10, 2008. The following summation is drawn from audio recordings of those meetings. Minutes are also available. (Admin. R., Vol. VI, 1290-95, 1296-1301.) Some of the consulting experts participated on April 9, while others participated on April 10. The April 9 meeting presented the views, primarily, of Mark Hammond and Dr. Grueneich. Hammond introduced the concept of a "kingpin" to oversee Y.M.'s programming. ("Y.M. Parts 1 + 2, April 9, 2008," Audio CD, minute 22.) Dr. Grueneich agreed with this concept, indicated that there would be heavy staff training demands initially and someone would need to oversee this process and other aspects of program setup with time commitments above those associated with mere consultation services. (Id. min. 23-24.) For her part, Ms. Millay voiced the view that the person would not need to be a behaviorist, but could be a psychiatrist like Dr. Grueneich. (Id. min 26.) Dr. Grueneich stated he would not fill the role. (Id. min 28.) Hammond indicated that the best program would have a supervising specialist on site or "on line" for training and program development, for perhaps half a day weekly. (Id. min. 29-31.) Dr. Grueneich agreed that there was a need for this much time to be devoted to training. (Id. min. 32.) Hammond

14

opined that the person in charge should be a behaviorist and that the other consultants should

work through this person to avoid having other experts introducing plan components to the

teacher that might upset the behavior plan.  (Id. min. 33.)  Millay expressed the view that

consultants in deaf-blind services were being underutilized and that deaf-blind communication

strategies should be dominant rather than the behavioral approach.  (Id. min. 33-34.)  To this, Dr.

Grueneich observed that Dr. Talbot-Fox would not be available for this intensive role and

Hammond indicated that the person in the kingpin (or "queenpin") role would obviously want

consultative input from a consultant with deaf-blind education expertise.  (Id. min. 35-36.)  Dr.

Grueneich thought a psychologist probably would not be the best person for the role and

Hammond suggested that a behavior analyst would likely be best for this central role.  (Id. min.

36.)

Ms. Millay acknowledged that there is limited availability of deaf-blind consultants in the

area, and suggested that the team ask Perkins if they have somebody for this role and also

suggested exploring what might be available in the way of contract services from the North East

Deafblind Project.  (Id. min. 37.)  In her view, the person in charge of programming should be

someone with at least a master's degree in deaf-blind education, arguing that a psychologist (or

behaviorist) without this background would be hard pressed to fill the oversight role effectively.

(Id. min. 38.)

Based on these statements, Attorney Herlan responded that a picture was emerging that

someone was needed to provide a lot of oversight and training services initially and that the deaf-

blind experts do not seem to be on hand, or have the availability, to dedicate that level of services

to Y.M.'s program.  (Id.)  Hammond stated that this is "absolutely true."  (Id. min. 39.)  In Dr.

Grueneich's view, availability is essential and, if a programming piece is missing like deaf-blind

experience, then it will have to be supplied through consultation, which is "more realistic" to expect because, if there is one person who can provide it all, he or she is not going to be available to intensely set up and structure Y.M.'s program during its startup phase.  (Id. min. 40.) Millay restated her position that deaf-blind education is the core program and that any psychological component is simply a troubleshooting piece and should not be dominant.  (Id. min. 42.)

At the conclusion of the meeting, Millay asked Dr. Grueneich what advice he would give for making the next placement more positive than the last placement, emotionally or psychologically.  He stated that the transition plan should be good and that the environment needs to be set up for her disabilities.  He indicated that he would send his comments concerning the draft transition plan by way of email.  (Id. min. 47-49.)

In addition to the usual members of Y.M.'s IEPT, Chuck Anderson, a programming representative of KidsPeace, and Rebecca York, Y.M.'s prospective special education teacher were in attendance April 9.  They both attended the April 10 session as well.

The IEPT reconvened on April 10 without Dr. Grueneich but with Dr. Talbot-Fox of Perkins and Dr. James Artesani of the University of Maine participating by phone.  The meeting began with introductions, after which Dr. Talbot-Fox summarized her November 2007 evaluation.  ("Y.M. 3 Part 1, April 10, 2008," Audio CD, min. 2.)  She noted that Y.M. had progressed since 2004 with some improvement in language and other communication skills, including better word comprehension and an improved ability to follow directions in functional areas.  Improvement in social interaction was also noted, though some behavioral problems in both self-injury and aggression persisted.  (Id. min. 3-4.)  Dr. Talbot-Fox felt that the signs of progress were encouraging and that an emphasis on communication and life skills was needed in

Y.M.'s program, but she also described a "strong need for behavioral programming."  (Id. min. 5.)

Millay sought feedback from Dr. Talbot-Fox concerning the draft transition plan, suggesting that the timeframes stated therein were *too short* as compared with what transpired during the 2006 ESY program administered by UCP workers.  She also wanted to hear Dr. Talbot-Fox's recommendations in light of the unsuccessful reintroduction of Y.M. to Surry Elementary in September 2006.  (Id. min. 6-8.)  Dr. Talbot-Fox responded that she had focused on the transitional plan generally, without considering specific placement location, and stated that the plan is well thought out, including the proposed one-month participation by UCP workers.  (Id. min. 8-10.)  Millay repeated her concern and perspective that the last transition (fall 2006) was so negative that there might be carryover into any new program.  (Id. min. 10.)  Dr. Talbot-Fox adopted something of a wait and see viewpoint, indicated that special education staff should spend some time working with Y.M. in the home prior to the transition and before other students are attending the school in question.  In her view, the plan looked quite good.  (Id. min. 10-11.)  What was very important to her was that the school day should not be cut short on account of any behavioral issues; that poor behaviors not result in early release from the program.  (Id. min. 12.)

Millay expressed concern about not being included in the loop when an expert eventually took over the program.  (Id. min. 13.)  Dr. Talbot-Fox did not have an answer for this concern, but stated that the psychological piece of the IEP calls for a specialist in behavior.  She stated that support directed to development of a behavior plan and training staff is essential at the front end, including speech and language training.  (Id. min 15.)  In her view, staff would need more immediate feedback to be available at the beginning and this oversight might well need to be

daily, particularly in light of the amount of training needed ahead of Y.M.'s entry into the program.  (Id. min. 15-18.)

Attorney Herlan asked Dr. Talbot-Fox what amount of deaf-blind consultation would be required and how it might best be provided, assuming speech and language people and psychological/behavioral people are more readily available to oversee the program.  (Id. min. 19.)  This question prompted some searching discussion about what programs and what individuals might be available in this geographic area.  (Id. min. 20-23.)  Dr. Talbot-Fox deferred on the question, agreeing with Attorney Herlan that as much involvement as is possible would be good.  As for the draft IEP, Dr. Talbot-Fox indicated that it looked good and her comments suggested that it would suffice for the special education teacher/staff to consult with a deaf-blind education expert, with the expert possibly visiting the program once per month.  (Id. min. 24-26.)  She agreed with the suggestion that a reduction in maladaptive behaviors would be an appropriate goal for the IEP.  (Id. min. 29.)

On the issue of mainstreaming, or least restrictive environment, Dr. Talbot-Fox indicated that a placement amidst students with severe emotional problems and acting out issues would not be appropriate for Y.M. because she would be frightened in the presence of such behaviors.  (Id. min. 30.)  She feels that Y.M. can adapt to new programming with behavioral support from staff, however, and also stated that involvement with other disabled students would be best initially because it would better integrate with educational programming, with social opportunities with non-disabled peers coming later.  She also felt it would be better to have interventions and strategies worked out in the classroom first on a trial basis.  (Id. min. 31-33.)  She opined that it would be important to make Y.M. appreciate that she is part of a group of students initially, with limited interaction at the start, such as a morning meeting, but that her programming would not

be integrated.  (Id. min. 34.)  As for the "back and forth," and how Y.M. might behave in order to control her participation in the program, Dr. Talbot-Fox described that as the concern of behavioral programming.  (Id. min. 36.)  She preferred a long-term placement, in light of Y.M.'s age and past disruption in programming, and stated that Y.M. should not be self-contained without social interaction.  (Id. min. 37.)  She explained that any gains would come from long-term effort.  (Id. min. 38.)

Dr. Talbot-Fox was noncommittal about her future involvement in Y.M.'s programming and indicated it would be best for the team to see who else they might involve locally.  (Id. min. 39.)  She also expressed the view that having too many people involved is something to be avoided because of the potential for confusion, which is an idea that supports the kingpin/queenpin descriptor used by other participants.  (Id. min. 39-40.)

In response to a question from Betsy Dyer, a speech pathologist, Dr. Talbot-Fox ranked Y.M.'s disabilities in the following order of programmatic importance:  blindness, mental retardation, and autism.  (Id. min. 41-42.)  In her view, "blindness is number one" as Y.M.'s hearing is "adequate."  Severe mental retardation came second.  Autism was regarded as an additional social factor, but not one of primary importance.  (Id. min. 43-44.)  The "deaf-blind" term was not utilized by Dr. Talbot-Fox, even though it was put forward in Ms. Dyer's question. Dr. Talbot-Fox was generally unwilling to run with Millay's subsequent hypothetical question about what to do if Y.M. would not enter a building for programming.  Dr. Talbot-Fox suggested that Y.M. be allowed to wear headphones when entering the building, be escorted by a person or persons she likes, and be presented with a low stress, enjoyable first week of programming.  (Id. min. 46-48.)  Dr. Talbot-Fox's final comment was to the effect that there are blind people in public schools everywhere.  (Id. min. 49.)

Dr. Artesani addressed the team next. Among his more significant comments, for present purposes, was the view that the distinction between normal versus disabled peers should not be the focus because the issue is not least restrictive environment, but what Y.M. will be doing in her program wherever she is. He expressed the view that she can practice social skills with either sort of peer, so long as the peer in question can interact socially with her. (Id. min. 52-53.) He stressed the need to control the environment and stated that the behavioral program can only succeed if there is a curriculum that engages Y.M. (Id. min. 54.) In his view, creating and modifying the environment over time is more effective than emphasizing least restrictive placement. (Id. min. 58.) Based on his work with Y.M. in 2005, he stated that her needs are so complex that program implementation would be difficult, flexibility would be critical, and heavy initial oversight would be necessary. (Id. min. 60-61.) He could not think of someone who could supply all of the behavioral, psychological, and deaf-blind pieces, and opined that the person in charge would have to consult with others. (Id. min. 63-64.) He opined that Dr. Tim Rogers was perhaps the best local candidate for the role. (Id. min. 66-67.) Millay expressed doubt, raising Dr. Rogers's limited experience with deaf-blind education. (Id. min. 69.) Dr. Artesani disagreed, in effect, stating that the issue is one of adapting these approaches to the blind student, so that a behaviorist with a blind education consultant is going to be the model. (Id. min. 70.) The issue of training programs was raised at the end of the session, and Rebecca York indicated that she had been participating in Perkins-sponsored training programs. (Id. min. 73-76.)

The next item discussed was William Ward's orientation and mobility evaluation and draft goals. This portion of the meeting is not critical to the pending dispute. In short, Mr. Ward indicated that his plan could be adjusted to whatever location was chosen for placement, with a

very heavy initial consultation. He agreed that a long-term placement would be best. ("Y.M. 4, Part 1, Apr. 10, 2008" Audio CD, min. 5-7, 12-15.)[3] Following Ward's presentation, Attorney Herlan inquired of Millay whether they should go through the goals and objectives of the IEP page by page, or not, depending on her view of the model in the IEP, which still needed some refinement concerning goals for OT, PT, and adaptive PE goals. (Id. min. 19.) Millay acknowledged they would need refinement based on placement and emphasized that she was more concerned on transitional goals. (Id. min. 22-24.) Over the next several minutes there was a general group expression to the effect that these components would need to be developed and ironed out in the context of the program, largely overlapped with one another, and would more appropriately be introduced by the special education teacher in the course of educational programming, based on consultation with contract service providers rather than through direct service provider intervention. (Id. min. 24-35.) At the conclusion of these suggestions, Millay expressed the view that some expert direct participation would be good, though specifics were not indicated. (Id. min. 36.) When Attorney Herlan asked, again, whether Millay would accept an IEP lacking a specific OT or PT goal so long as the IEP specified that these services are in the program, Millay indicated that it would all depend on the setting, but she did not voice objection to the perspective that these services would be best provided using functional opportunities, in context, to develop the skills in question. (Id. min 36-48.)

The next programming issue addressed at this meeting concerned how to express a behavioral goal, with Attorney Herlan asking whether behavior is or is not the driving force behind IEP/placement. (Id. min. 49-50.) Herlan sought to include a goal of reducing incidents

---

[3]        The record includes a "Y.M. 3, Part 2" disk, but that disk does not include any salient portion of the April 10 meeting.

of behavior, but Millay stated that the focus should be "environmental engineering" without getting caught up in defining behavioral goals. (Id. min. 51-52.) Herlan stated that behaviors have been a major concern in the past, specifically in terms of removing Y.M. from programs and making placement decisions. (Id. min. 53.) One of the school representatives indicated that there is a behavior plan and it needs behavioral goals. (Id. min. 59.) Millay objected that they did not really have an objective behavioral baseline to measure against because Y.M. has been out of programming so long and has developed more adaptive skills in that time. She was backed up on this by one participant, who voiced the perspective that Y.M.'s behaviors are a better indicator of how adequately the program meets her needs. (Id. min. 60.) Ms. Dyer seemingly concurred, observing that behaviors are communicative, though she also indicated that there are still inappropriate behaviors that should be discouraged. (Id. min. 60-61.) Finally, Millay objected to the draft characterization of Y.M., saying that it put her in an unfair negative light by focusing on problem behaviors. School representatives indicated that they would revise the description to include some positive attributes. (Id. min. 67-69.)

The last ten minutes of the meeting involved Millay's accusations that Surry was shirking its duties by not providing services presently, "in the community," and that Attorney Herlan's involvement and "the litigation approach to programming" had been detrimental and unfair to Y.M. However, she also made it plain that she would refuse to accept any services in four alternative placements (presumably corresponding with KidsPeace, Surry Elementary, Stillwater Academy, and her home). She indicated that many of the IEP services could be provided "in the community" insofar as services can be delivered independent of place. In the course of this presentation, Millay expressed the view that the preexisting IEP should be implemented at that time "in the community." The school's response, in effect, was that Millay would need to accept

services in one of the locations offered by the school and that the validity of that approach was currently being considered by the due process hearing officer. (Id. min. 70-75.) Principal Ehrlenbach expressed the opinion that there had been a program in place since July 2007, albeit set up "since October," but that Millay had chosen not to take advantage of it, to which Millay responded that there had never been adequate staff training. ("Y.M. 4, Part 2, Apr. 10, 2008," Audio CD, min. 1-2.) The meeting ended shortly thereafter.

Later on April 10, Dr. Grueneich e-mailed Melissa Beckwith and reiterated Dr. Talbot-Fox's positive assessment of the Rogers behavioral transition plan and agreed with Dr. Talbot-Fox's recommended modifications. Dr. Grueneich also contributed the object exchange component that was ultimately incorporated into the final plan. (Admin. R., Vol. VI, 1389.) In a letter dated April 14, 2008, Dr. Rogers declined a request that his group supply the initial programming oversight, as had Dr. Grueneich, Dr. Talbot-Fox, Mark Hammond, and Dr. Artesani. (Id. 1386.) Dr. Rogers's Behavioral Intervention and Support Plan became part of Y.M.'s developing IEP. (Id. 1372-76.)

On April 15, 2008, Surry issued its Written Transition Plan (Id. 1377-1380) and its Draft Goals for 2008-2009 SY (Id. 1381-82). The transition plan indicated an intention to transition Y.M. "back into a public school setting." (Id. 1377.) An April 29, 2008, letter from Melissa Beckwith to the IEPT enclosed the Draft IEP and indicated an intention to finalize the IEP and make the placement decision at a May meeting (Id. 1347-71), eventually set for May 27, 2008 (Id. 1340-42).

### 3. *May 27, 2008, IEP Team Meeting*

Like the April meetings, the May meeting was recorded and the recording is available in the record. Surry also produced minutes of the meeting. (Id. 1302-1309.) The following account is drawn from the audio recording.

At the start of the meeting, Millay objected to any placement decision being made due to the absence of certain service providers. ("Y.M. 6, Part 1" min. 1-2.)[4] The minutes reflect that Dr. Artesani, Betsy Dyer, Dr. Grueneich, Mark Hammond, Dr. Rogers, Dr. Talbot-Fox, Maria Timberlake, William Ward, and Rebecca York were not present for the meeting. (Admin. R., Vol. VI, 1302.) Attorney Herlan represented that the revised IEP recharacterized behavioral challenges as communication programming concerns and that service levels in the IEP incorporated service level recommendations. (Y.M. 6, Part 1, min. 3-6.) Millay reiterated that providers should be present to express their views on service levels and goals. (Id. min. 6.) She also objected to the fact that a specific deaf-blind education consultant was yet to be identified and that the core team lacked the ability to make any final finding without this person's aid. (Id. min 6-7.)

Next, Millay made it clear that she would not cooperate with any transition plan that would involve a teacher entering her home or utilizing UCP workers in any respect. In her words, the school would have to do the entire transition itself, despite her acknowledgement that the draft transitional model had been successful in the past. (Id. min. 8-9.)[5] However, a UCP

---

[4]      Three audio disks in the record contain the same audio file off the first half of the May 27, 2008, meeting. These disks are the "Y.M. 5, Part 1" and the "Y.M. 5, Part 2" disks, which are mistakenly labeled as April 10 recordings. I have cited the Y.M. 6, Part 1 disk only because it is correctly labeled as a recording of the May 27 meeting.

[5]      Later, Millay would state that her home was not an option "for the summer." (Min. 18:39-43.) She would allow that there would be windows of time in the home, but that it is not a school setting for programming to take place. (Id. min. 35.)

representative spoke up and indicated that the transition plan would be fine so long as the special education teacher and education technician were shadowing UCP workers rather than interacting with them and Y.M. (Id. min. 10.) Melissa Beckwith then observed that all of the consulting experts had conducted their reviews understanding that some home involvement would take place. (Id. min. 12.) The foregoing account of the April proceedings certainly supports that perspective. Millay persevered in her objection, stating that transition would be unsuccessful and "cannot be done" on the existing plan because conditions were unfavorable, due, in part, to past "trauma." (Id. min. 12-15.) She did allow, however, that she would view the transition plan as great if she were in Dr. Talbot-Fox's position. (Id. min. 14.) In her view, Y.M. was at that time receiving programming "in the community" and the plan needed to be revised to account for a transition from the community to an established setting having four walls and structured programming. (Id. min. 15-16.) UCP would later water down this characterization, too, stating that on "a nearly daily basis there is community-based time," which "really varies." It could be less than an hour or possibly a few hours, though there is full-day participation by the UCP worker(s). (Id. min. 18-20.) Millay opined that transition from this more free-ranging program could take a year. (Id. min. 22-24.) She also expressed that two months of an ESY program would be needed to allow special education staffers and Y.M. to become familiar with one another and to introduce Y.M. to the new programming environment very gradually. (Id. min. 35-40.)

The conversation then shifted away from transitioning toward service provision and placement. Millay began this discussion by noting that she could not predict how Y.M. might respond to any setting. (Id. min. 41-42.) In this portion of the discussion, Millay allowed that the Perkins program itself had a significant behavioral component built in. (Id. min. 47.) She

felt it would be a shame to have the program fall apart or to have to place Y.M. in a more restrictive setting simply because of lack of availability of an expert to oversee the program. (Id. min. 48.) Attorney Herlan recalled for the group that all of the experts agreed to a so-called "kingpin" model. (Id. min. 49.) Millay's position, however, was that no one other than a deaf-blind educator could fulfill this role, while acknowledging that availability is limited. She expressed the view that the State has access to deaf-blind educator resources, and that Surry must press the State to deliver. She advocated a "total communication" program that impacts every area of service. (Id. min. 50-51.) The IEP, it was noted, recognizes these relationships and the centrality of communication in the service mix. (Id. min. 52.) Millay expressed the view that psychological services be consolidated with behavior management and that one person should be found with this experience and autism experience to serve as consultant in all of these special education areas, rather than having a behaviorist be at the center of the program. As for deaf-blind services, she wanted a consultant to be available on a weekly basis, though she conceded there was an availability concern. In her words, she would pressure the State for availability. (Id. min. 55-61.)

As a counterweight to Millay's remarks, school staff and Danica Frederick, Occupational Therapist, shared the view that the behavioral piece is as important for program structure and staff guidance as is it for reacting to any specific incident of behavior. In other words, a behavioral perspective would be there primarily to guide program implementation rather than to monitor so-called "negative" behavior. (Id. min. 3-4.)

Jeff Jones chimed in with a question about the "deaf-blind" concept insofar as Y.M. is not deaf and he recommended Therese Pawletko, Ph.D., of Portsmouth, who specializes in blind autistic students. Attorney Herlan indicated that Pawletko had stated she had availability. (Id.

min. 5-6.)  Millay did not approve based on the autism overlay and she opined that Pawletko's expert qualifications in blindness would not measure up to an expert in "deaf-blindness."  She expressed willingness to let Pawletko serve as a psychological consultant, but "she isn't the deaf-blind consultant."  (Id. min. 8-10.)  Thereafter, Millay returned to the theme that a good program would rule out behavioral issues.  Attorney Herlan countered this position, stating, based on everything heard to date, including from Millay herself, that a transition to a school-based program would inevitably involve communication by behaviors to express dissatisfaction with the change from her far more comfortable UCP programming.  Millay's response was that the IEP set up a program to manage Y.M. rather than to educate her, particularly given the absence of a deaf-blind consultant.  (Id. min. 11-13.)

Lisa Jones, Physical Therapist, observed that a deaf-blind consultant, while needed, would have to work as a team with the behaviorist to ensure consistent programming structure.  (Id. min. 14.)  Alan Wittenberg, Musical Therapist, seconded this notion, arguing that if they were going to wait until the perfect dream team were available, it would not work, and they needed to avoid getting stuck and should start with what is available.  (Id. min. 16.)

Millay and Herlan agreed, remarkably, that a deaf-blind service level was called for, and Herlan indicated that they would need to specify the amount of this service and deal with the fallout of that decision.  (Id. min. 17.)  Jeff Jones agreed that this was needed from the start for staff training, with a possible level of once per week.  (Id. min. 18.)

Attorney Herlan then indicated that he would request a proposal from Millay and then direct the issue to Melissa Beckwith.  Millay sought to "shift the emphasis from behavior to education."  She stated that behavior management should play a minor role, that she had "no interest" in seeing any regression, that she wanted there to be a deaf-blind consultant on board to

work with the psychological person, "particularly initially," and that this person should have been present for the meeting.  According to Millay, the environment would be the key and she would not allow Y.M. to be in any program if self-injurious behavior arose there.  (Id. min. 20-24.)  Beckwith agreed that there was a real need for collaboration and training by a consultant in deaf-blind education and by a psychological/behavioral consultant.  She called for weekly consults, on-site, by hopefully only two persons, but possibly one.  (Id. min. 25-28.)  Millay said the deaf-blind consultant level should be 10-15 hours initially, for training and observation, with that person then having input into future service levels rather than anyone who has spoken on the subject to date.  (Id. min. 29.)  Beckwith agreed that initial deaf-blind services levels should be increased at the front end.  (Id. min. 29-30.)  She agreed that this person could then help them set subsequent service levels.

As a result of this confab, there was general agreement that a deaf-blind consultant would be "key" to program set up and development at roughly 15 hours for the first consult.  The psychological/behavioral piece was similarly set for 10-15 hours initially, with 5 hours per week thereafter to ensure program implementation and continuity.  (Id. min. 30-34.)  Kelley Sanborn indicated that psychological services at 10-15 hours, mirroring the deaf-blind consultant, would not be about behavior modification, but setting up and structuring programming.  (Id. min. 35-37.)  Thereafter, the team made subtle adjustments to the service levels stated for OM, OT, PT, adaptive PE, and music therapy.  They then turned to the 2008 ESY (summer) program issue, which was to consist of a transition plan.  This steered the discussion to placement.

Following prefatory remarks (min. 51-54), the group agreed that Y.M. should be regarded as a high school student for purposes of a long-term placement (min. 55-57).  Millay expressed the view that Mount Desert Island High School would be the appropriate placement and that she

should not go to a place for emotionally disturbed children or a place where all students have disabilities.  (Id. min. 58-59.)  Beckwith opined that "program drives placement" and that she did not believe there was a high school in Hancock County that would be able to provide the program set out in the IEP, so that a day treatment model would be most appropriate, indicating her preference for the KidsPeace program.  (Id. min. 60-61.)  Principal Ehrlenbach seconded this, noting that the Perkins placement had been made along these same lines, recognizing the need for more intensive services than the public schools provide.  (Id. min. 62.)  Lisa Jones stated that programming would need all of the components in the IEP to be successful, regardless of placement, without knowing where it could be made to happen.  (Id. min. 63.)  Chuck Anderson of KidsPeace then shared that responsiveness to intensive individual programming is exactly what KidsPeace can offer and that it can work with the support providers.  He believed that a meaningful program could be placed there and stated that no school can guarantee safety.  He also indicated that the staff at KidsPeace is already trained in multiple therapeutic models and that supervision would be sufficient to ensure safety.  He indicated that KidsPeace would not toss Y.M. into the middle of the school, and that it would be a "guided and sheltered" process with opportunity for reverse mainstreaming.  He felt that a very appropriate program could be put in place over the course of the summer with consultant help that would put all of the pieces of the IEP in place.  (Id. min. 63-66.)  Alan Wittenberg was conflicted.  He felt that a public placement would not be "out of the question," but he felt that KidsPeace could provide a good program and that Y.M. would actually be less likely to have to interact with children with serious issues because it would be easier to contain her program in that setting as compared with a public school setting.  (Id. min. 66-67.)  Millay said "no" to these suggestions, indicating that Y.M. would be isolated and needed a more social setting to develop social skills.  (Id. min. 67.)  The

response to this was that Y.M. would have her own programming space but would be incorporated into the KidsPeace autism program without isolation. (Id. min. 68.) Chuck Anderson indicated that deaf-blind consultants would be utilized, that the KidsPeace staff would be excited about developing this new expertise, and that the program had previously worked with blind students and developmentally delayed students in addition to autistic students. (Id. min. 68-69.) Millay's response was that any setting would bring in the essential consultants so it should not need to be a day treatment setting as opposed to a public school. She felt that the absent experts should be consulted on the placement decision. (Id. min. 69-70.) Jeff Jones indicated that he would ideally like to see placement in Perkins, recognizing that it was an even more restrictive situation, but he also expressed the view that it would be possible to implement Y.M.'s IEP in a public school setting. (Id. min. 70-71.) Elesia Moore questioned whether a KidsPeace placement would be a long-term placement in light of the recommendation that programming not change in the short term, or whether there was a transfer to public school contemplated. She also indicated a lack of understanding why the program could not ultimately occur in a public school. (Id. min. 71-72.) Ms. Beckwith responded that the advantage of KidsPeace was that its staff could provide the "wrap around" services better and would have more built-in supports for coverage, with onsite, full-time behavioral and psychological services. She allowed that deaf-blind consultation would be introduced from outside, but noted that the autism program at KidsPeace provided a better foundation from which to administer the IEP in question. (Id. min. 72-73.) Danica Frederick agreed that KidsPeace had the advantage of greater "wrap around" supports and stated that, based on her past experience with Y.M., her volume and behavior might lead to even greater isolation at Mount Desert Island High School than within KidsPeace because the public school offers a small setting with a life skills program designed for

30

a group of students who are higher functioning than Y.M.  Frederick was concerned about Y.M.'s ability to participate in that program, given her IEP, and felt that Y.M. would actually be drawn out of group programming to a greater extent than might happen at KidsPeace.  (Id. min 75-77.) Lynn Maddocks worried that we are now in "make it or break it mode" and the level of baseline expertise at KidsPeace would be more reliable than what is within the public school, so that, "at least initially," the IEP program should be developed and refined within a day treatment model. She opined that, with Millay indicating that she would pull Y.M. from any program if behaviors become an issue, KidsPeace would be the best setting to start in given that its staff has a greater level of expertise with behavioral treatment models.  (Id. min. 77-79.)  Finally, Kelley Sanborn indicated that a KidsPeace placement would be the most appropriate setting for this IEP, insofar as Perkins is not an option.  (Id. min. 79.)

The discussion then returned to Ms. Millay.  She discussed her personal perspective of what is possible in the setting of a public life skills program and opined that, even if MDI does not have availability, there should be placement in another public life skills program rather than at KidsPeace, especially if Y.M.'s school peers would be limited to children who are participating in an autism program.  She expressed a view that Y.M. should not be placed in a special category for programming purposes because she is able to interact appropriately with others.  However, she also allowed that if Y.M. were able to transition more easily, she could go to KidsPeace for two years to take advantage of what they have to offer, and then move on, but that, as it is, Y.M. loses too much in transition due to staffing changes.  At the same time, she expressed the view that Y.M. could be successful with even one-third of the services stated in the IEP.  She further stated that she would consider Y.M. to be too vulnerable at KidsPeace because there are emotionally disturbed children in its broader program.  Millay stated she was "not

willing" to change placement from a public school setting and that, if they need to spend another year fighting over it they would simply bear the responsibility for that.  (Y.M. 7, Part 2 audio CD, min. 1-6.)

Attorney Herlan returned the discussion to the ESY summer transition program.  (Id. min. 8.)  Millay agreed that Y.M. needs to be transitioned into a program, and that the personnel transition could happen over the summer, with consultants being lined up and staff trained gradually in that time.  (Id. min 9-12.)  How much time Y.M. would then be willing to spend in a school program Millay would not predict, though her statement suggested that this transition might well be difficult.  (Id. min 13.)  Attorney Herlan concluded the meeting, indicating that an IEP would be issued and that it would be circulated for further comment, including for input from the available experts.  Among other final comments, Millay implored Surry to look around for another potential public high school placement.  (Id. min. 21.)

Surry circulated its IEP on June 11, 2008.  (Admin. R., Vol. VI, 1310-39.)  The IEP specifies 32 hours per week of direct educational services in the day treatment setting by special education staff.  A two-month transition through a summer ESY program is also indicated. Consultative services were front loaded as discussed in the preceding meetings.  (Id. 1313-14.) Surry also sent Millay written notice of IEP and placement changes.  The notice outlines Surry's assessment of the meetings and the basis for its findings with respect to programming and placement.  It offers a faithful characterization and summary of what transpired within the preceding IEPT meetings.  (Id. 1284-1288.)

On June 20, 2008, Hearing Officer Peter Stewart issued his decision concerning the parties' dispute over programming decisions from the summer of 2007 through the end of the 2007- 2008 school year, finding that Surry's willingness to pay for a Perkins placement was

enough to satisfy all of its obligations under the IDEA.  In light of this development, on July 10, 2008, Melissa Beckwith distributed a letter to the IEP team to request a meeting to add Perkins or a similar institution as an alternative placement option for the 2008-2009 school year.  (Id. 1274.)

### 4.  *July 23, 2008, IEP Team Meeting*

The IEP team convened July 23, 2008, and the meeting resulted in a written notice, sent August 18, that residential placement is an available option for implementation of the IEP.  (Id. 1263-68.)  Among the participants were Dr. Talbot-Fox, Dr. Therese Pawletko, a blind/autism education expert, Dr. Tracy Luiselli, a deaf-blind expert at Perkins, and Dr. Margaret Fernald,[6] a local psychologist.  Since the May meeting, Drs. Fernald and Pawletko had agreed to provide consultative services for the blind education and psychological components of the IEP.  (Id. 1278, 1280.)  Minutes are not in the record, but an August 18 written notice serves that purpose. An audio recording is also available.

Dr. Talbot-Fox thought it would be helpful for her to see the KidsPeace program and could not comment on that placement decision without doing so.  Thereafter, Ms. Millay asked her to address Y.M.'s suitability for a public placement.  Dr. Talbot-Fox said there was a gain in Y.M.'s coping skills, but that she was concerned about the long absence from programming, so there would be a difficult transition back to the demands of a school program.  She could not predict how that would go.  She could not comment on specific public programs, having not seen these either.  She did believe any transition would be quite difficult.  She indicated that this transition could be as difficult as a transition to Perkins, but for the ability to return home on a

---

[6]    Dr. Fernald contracted for five hours weekly.  (Y.M. 7/23/08, Part 1, Audio CD, min. 73.)

daily basis. Success would turn, she predicted, on the strength of the support system in place at any location, including "behavior regulation." (Y.M. 7/23/08, Part 1, Audio CD, min. 8-13.)

Ms. Beckwith indicated that she felt they should add in a residential option in light of the hearing officer's decision. (<u>Id.</u> min. 13-14.) Millay stated that the options must also include a least restrictive option, to which Beckwith stated that the intensity of Y.M.'s needs exceeded what was available in the public setting. (<u>Id.</u> min. 15-16.) Attorney Herlan directed the issue to Dr. Luiselli, who said her thoughts were very similar to Dr. Talbot-Fox's and that she was not clear that Perkins would be an option, given the intensity of Y.M.'s needs and her past response to residential placement. (<u>Id.</u> min. 17-19.)

Dr. Luiselli indicated that she had been engaged in a search for someone to provide the deaf-blind services in the IEP and that she had great difficulty identifying anyone who would be willing to oversee Y.M.'s program, but that there may be a measure of consultation services available from Dr. Susan Bruce of Boston College. (<u>Id.</u> min. 26.)

Surry indicated that the special education teacher could start anytime with the transition component. (<u>Id.</u> min. 30-31.) Jeff Jones felt that they were faced with making the program work locally rather than in a distant residential program. (<u>Id.</u> min. 31.) Another ten minutes were addressed to the appropriateness of a residential placement at KidsPeace or a similar program. That issue is not presently before the Court because Hearing Officer Smith based her decision not on the offer of residential placement but on the offer of a local, day treatment placement.

Dr. Pawletko spoke next, after various critical remarks by Millay in regard to protracted meetings and Surry's failure to accede to her demands on placement. Dr. Pawletko stated that her biggest concern was where services could best be implemented. A residential placement could provide wrap around services best, she indicated, but for the adjustment factor. The

fallback, in her view, would be for a program with as many "stop gaps" available as possible. She felt that a typical public school placement would be hard pressed to provide that level of comprehensive services because of the tremendous amount of work that was called for. Under the circumstances, she believed that day placement would be "ideal" at this point because systems and backups would be in place. Program development within the public school setting would be very difficult, in her view. (Id. min. 42-45.) To this, Millay embarked on a defensive discussion about the former Perkins placement and the circumstances of its early termination that does not advance the instant dispute. Dr. Pawletko indicated that her assessment was based on a review of evaluations and recommendations by Dr. Talbot-Fox and others and that the matters Millay was speaking to did not provide a basis for her assessment about day treatment versus a public school program. (Id. min. 49.)

Dr. Fernald addressed the issue next. She stated that she did not know Y.M. and was not going to speak about her, but was eager to shadow UCP staff and start developing programming. Her initial impression was that moving Y.M. from her home/community program to a public school setting would be a "huge leap," and that placement in a day treatment program with more structure, support, and personnel would be better and make more sense in terms of "stepping up" to programming. She opined that just as residential placement failed for being too restrictive, a public school placement would be as susceptible to failure for being too "unrestrictive." (Id. min. 50-53.)

Dr. Luiselli described the training that would need to take place as very detailed, intensive daily training of staff for Y.M.'s program, with coaching in the classroom. (Id. min. 55-56.) As for program oversight, Drs. Pawletko and Luiselli agreed that what was called for here was intensive consultation over a long period of time.

Thereafter, Attorney Herlan raised the prospect of Ms. York beginning her shadowing activity and starting up consultation with Dr. Fernald, Dr. Pawletko, and a deaf-blind education expert, explaining that this should start wherever the future placement might be. In this regard, he posited that the Court might order a stay put placement in Surry, whereas Millay insisted upon a high school and Surry was calling for day treatment. He thought it was time to take the preliminary steps toward reintegration because these steps would be the same regardless of ultimate placement. (Id. min. 64-67.) When asked if she would permit Ms. York to shadow the UCP workers, Millay indicated that she would, but indicated that York had failed to begin this process in the past. Then she imposed various caveats about how shadowing should occur. (Id. min. 69-72.) Millay later indicated that they should not "reinvent the wheel," suggesting that old programming would suffice, while simultaneously maintaining that the two-month summer reintegration plan was totally inadequate and would not work. (Id. min. 77-78.) It appeared that Millay, Fernald, Pawletko, York and the UCP workers would collaborate to start the ball rolling. (Id. min. 79.) When Dr. Fernald asked about shadowing, Millay wanted that to happen on days other than when York was shadowing, saying that Y.M. is so sensitive to her environment that a problem might otherwise arise. (Y.M. 7/23/08 Part 2, Audio CD, min. 0-1.) Millay indicated that she really did not agree with the plan developed by Dr. Rogers and wanted to lodge her objection. She said it was not going to work in fewer than *a couple years*. (Id. min. 4-6.) She also made it clear that she was not particularly interested in facilitating a working relationship with York. (Id. min. 8-9.) She stated that she would only go forward with reintegration on two conditions. First, a public school life skills program in Hancock County would have to be contacted with the opportunity to serve as placement and there would have to be a team meeting

during the summer in which administrators of one or more public high schools were present.[7] (Id. min 11-14.)  Second, IEP contract services would have to begin in the community setting while the shadowing process was ongoing.  (Id. min. 14.)  Millay indicated, flatly, that KidsPeace would not be the placement, describing it as a "highly chaotic atmosphere," though she noted that the autism program is housed separately from programming for children who could be described as "in crisis."  (Id. min. 21-22.)  The meeting essentially dissolved at that point into a debate about school consolidation and school choice.  Millay requested at the conclusion of the meeting that all of the services in Y.M.'s IEP be provided immediately in the community and in office settings.  (Id. min. 28.)  Attorney Herlan indicated that Surry would attempt to implement the reintegration plan, recognizing that the IEP called for a gradual transition to new staff and programming rather than abrupt introduction of services in the community.  (Id.)  Millay announced that "the timeframe is gone for reintegration."  (Id.)  On the other hand, she indicated that the Surry should either attempt to enforce its contract with MDI or else find another high school.  (Id. min. 31.)

### 5. *August – October 2008 letters*

On August 4, 2008, Millay sent a letter to Dr. Fernald, with copies to Beckwith and the MDOE, reiterating her position concerning Surry's approach to programming and stating, among other things, that she appreciated the "potential value" of Dr. Fernald's and Dr. Pawletko's involvement, she felt that the tone of the July 23 meeting demonstrated an unproductive approach by Surry that was "likely to impact your and Dr. Pawletko's ability to be of assistance to [Y.M.] until the situation is resolved by the court, possibly in time for [Y.M.] to begin school

---

[7]     Kelley Sanborn was no longer attending meetings in the wake of Hearing Officer Stewart's decision, which she felt supported her own assessment that Y.M.'s needs were too extensive to be met in the life skills program at Mount Desert Island High School.  (Admin. R., Vol. VI, 1273.)

with her peers this fall, though likely later." (Admin. R., Vol. VI, 1261.) She suggested that, "in the interim," Dr. Fernald should simply familiarize herself with Y.M.'s evaluations and meet, if possible, with her past psychological providers, such as Drs. Grueneich, Podraza, and Talbot-Fox. (Id.)

Millay relayed the same message to Beckwith in an August 12 missive, indicating that it would not be productive for Dr. Fernald to meet with Millay or Y.M. until she had reviewed, for example, the MDOE Complaint Investigation Report, and that any meeting would be useless, in any event, unless Surry found a placement in a public high school. (Id. 1258.) She indicated that she would not meet with York, describing any meeting with York as a training session rather than a UCP shadowing session. Millay promised cooperation if a public high school placement were ordered:

> You are now asking me to give more of my time to facilitate their work [Drs. Fernald and Pawletko and Rebecca York]. And even now, I have promised Dr. Fernald that, once [Y.M.] is in a public life skills program (as she had been for seven years and which had been—when violations were not being committed and she was not repeatedly physically injured—her only successful program) I will give your personnel a great deal of my time, as I have always given it, both as a parent and as an unpaid, very qualified professional. But your expectation that I do so under the existing circumstances is remarkably disingenuous and unethical.

(Id. 1259.) Millay admonished Beckwith that there would be no agreement until Surry accepted accountability and a public life skills program was arranged. (Id.)

On August 20, 2008, Beckwith explored the possibility of a Perkins enrollment in a letter to Perkins. (Id. 1255.) On August 25, she responded to Millay's letter, stating that York was not seeking training from Millay, but was seeking to shadow Y.M. and the UCP worker. Beckwith asked whether Millay would permit the shadowing to take place. (Id. 1254.) Millay responded on September 2, denigrating York's ability and refusing to invest time unless there was a public

life skills program waiting for Y.M., indicating that Y.M. should simply be put in a public school and that the staff could meet her there.  (Id. 1253.)  Millay sent another September 2 letter characterizing the minutes of the July 23 meeting in her own terms and requesting that the minutes be amended.  (Id. 1251.)  With the start of the school year at hand, Beckwith requested a second time that shadowing commence, suggesting that shadowing should occur to prepare staff and Y.M. for the Court's stay put placement.  (Id. 1249.)  Millay passed on the offer in a letter dated September 6, 2008.

On September 18, Perkins conveyed a rejection letter concerning admission of Y.M. into its program, which it described as inappropriate for her needs.  (Id. 1234.)  Otherwise, throughout September 2008 the parties papered and backstopped their respective positions in various additional letters.  (Id. 1225, 1238-1245.)

On October 6, 2008, Superintendent Boothby wrote Millay to state that a return to Surry remains an option.  (Id. 1233.)  On October 7, Attorney Herlan wrote to the Crotched Mountain School in New Hampshire about the possibility of placement there.  (Admin. R., Vol. VII, 1408.)  Crotched Mountain indicated, on October 23, 2008, that it could accept Y.M..  (Admin. R., Vol. VI, 1205.)

### 6.   The stay put order and resulting December 16, 2008, IEPT meeting

The Court issued its stay put order in case number 07-178 on October 28, 2008, specifying that Surry Elementary was the appropriate stay put placement.  On October 30, Surry set out a notice for an IEP team meeting.  (Id. 1227.)  Ms. Beckwith e-mailed Ms. Millay to indicate that Surry had a classroom ready and available for Y.M. and that Ms. York was still online to serve as Y.M.'s special education teacher.  (Id. 1226.)  Scheduling the meeting became

yet another issue of contention, with various correspondence on the matter.  (Id. 1206-1209, 1217-23.)

The meeting eventually transpired on December 16, 2008, without Millay.  The IEPT met to discuss the implications of the stay put order and the status of the programming dispute.  Surry sent Millay an audio recording the same day and explained that a January meeting would be held to go over everything with her and to obtain her input.  (Id. 1198.)  The audio recording is in the file.

Susan Bruce of Boston College joined the IEPT as the new deaf-blind consultant. (December 13, 2008, Part 1, Audio CD, min 2.)  Dr. Therese Pawletko, consulting psychologist, was also in attendance, as was Rebecca York, Surry and School District special education staff, and others.  (Id. min. 3.)  Betsy Dyer went over Mark Hammond's most recent evaluation, which was the product of an August visit to the home by both Dyer and Hammond.  (Id. min. 5.)  Dyer described certain augmentative systems they devised and planned for to assist Y.M. in developing greater communication and independence.  (Id. min. 5-10.)  Planning concerning tactile switches for voice communication were discussed by Dr. Bruce and others.  Dr. Pawletko alluded to an October meeting at which class room set up was discussed and planned.  (Id. min. 11-17.)  Attorney Herlan conceded that they could not advance on the issue of Millay's request for OT and PT evaluations, but the issue was raised about those evaluations and a proposed audiological evaluation, and whether they might obtain consent from Millay for those.  The team agreed that they would be offered.  (Id. min. 18-19.)  The OT evaluation and PT evaluations were things the team thought should happen in the school setting.  (Id. min. 20-21.) Audiological testing was also discussed for a spell.  Of concern to Dr. Bruce was the issue of moderate hearing loss and how that might impact any augmentative equipment like voice boxes

and switches and how well Y.M. can hear speech when there is background noise. She indicated that it would be important to better measure Y.M.'s hearing because it is an important distance sense and would be important for future program development and intervention. (Id. min 23-25.)

The present team members then discussed the day treatment placement ordered previously and the option of residential placement which Perkins declined. (Id. min. 32-34.) Attorney Herlan raised the issue of what to do about the Perkins placement and explained that de-identified records and evaluations had been forwarded to another residential program, Crotched Mountain in New Hampshire, for its consideration. The team agreed to replace Perkins with the Crotched Mountain program after discussing its capabilities and facilities. Beckwith thought this would be the optimal long-term placement, but for the distance from home and Millay's past indication that she would not choose to go this route. (Id. min. 35-48.) When the issue came to Dr. Bruce, she indicated that she would have to see the program first and that she did not want to lose sight of mom's desire to keep Y.M. local. Dr. Bruce wanted the group to reconsider a high school option for her. (Id. min. 49.) Dr. Bruce expressed, however, that she had limited knowledge of local resources, local programming, and what services would be available upon transition out of school. (Id. min. 50.)

The group briefly discussed possible compensatory education services for a missed year, with Surry staff contemplating services through June 2015. (Id. min. 56-58.) Next, the group addressed the stay put order, acknowledged that it was difficult to predict how this would play out without Millay's input, and also noted that Millay had filed a request for reconsideration. (Id. min. 59-61.) Attorney Herlan discussed the Court's ruling at some length and explained the stay put concept to the group. (Id. min. 61-64.) School personnel indicated that staff and a classroom were ready in the Surry setting and that there had been an attempt to begin transition.

(Id. min. 66-67.)  The group remained concerned about how they would respond if Y.M. were presented at the school rather than reintegrated through a gradual transition program as set forth in the IEP.  (Id. min. 70-73.)  The group then spent a considerable amount of time identifying dates in January and February when they could reconvene with Millay in attendance.

Before disbanding, Dr. Bruce raised, of her own accord, her concern about discussing Y.M. as a student with autism.  According to her, deaf-blindness coupled with mental retardation is a generally-recognized exclusionary criteria in autism diagnosis because the deaf-blind and mental retardation disabilities make the student present as an autistic child.  Dr. Bruce suggested that there no longer be *any* outside evaluations to diagnose autism absent involvement by someone with deaf-blind expertise.  She also indicated that methods of instruction are different for deaf-blind students versus autistic students, making it a material concern for programming. (Id. min. 7-8.)  Attorney Herlan noted repeat autistic evaluations, including by Dr. Talbot-Fox of the Perkins Center for the Blind, and Dr. Bruce responded that it is possible for Y.M. to be on the autism spectrum, but that deaf-blindness is a red flag as far as exclusionary criteria are concerned.  (Id. min. 9-10.)  The group indicated that the IEP called for an individualized program, so that grouping her with some kids in an autism program would not mean she was being programmed as an autistic student.  (Id. min. 10-11.)  The meeting adjourned thereafter, following an extended period of determining mutually convenient dates for a possible follow-up meeting with Millay, though a follow-up meeting never occurred.

### 7.  *Mediation*

On February 12, 2009, the MDOE determined that compensatory education through the school year in which Y.M. turns 21 will satisfy the Corrective Action Plan (CAP).  (Admin. R., Vol. IX, 1861.)  However, as of that date, Y.M. was still not participating in an educational

program other than day habilitation, because the parties were not successfully achieving agreement about implementation of the stay put placement. (Id., 1881.) On February 27, 2009, I conducted a telephonic hearing with Ms. Millay and Attorney Herlan and discussed, among other things, whether the parties could meaningfully engage in some alternative dispute resolution, ideally with the involvement of the MDOE. (Case 07-178, Doc. No. 76.) A March 6 conference on the matter revealed that the MDOE agreed to the proposal, offering to provide a mediator and also mediation space. (Id., Doc. No. 79.) A March 20 status report indicated that, with the assistance of counsel for the MDOE,[8] a public high school would be sought that might be able to implement the IEP, and that Bangor High School indicated a willingness to accept Y.M. into its program subject to Millay's approval and an opportunity to meet with Y.M. (Id., Doc. No. 83.)

On May 15, a team meeting transpired at Bangor High School. (Id., Doc. No. 96.) At the meeting the group agreed on an IEP for the 2009-2010 school year and on a 2009 ESY summer program. (Id., Doc. No. 100.) The briefing cycle in Case 07-178 then commenced on the merits, with the Court denying Millay's request for reconsideration of its stay put order on June 18, 2009. (Id., Doc. No. 107.) The Court's determination of the merits portion of that dispute has already been related in Part B of this discussion.

**D.      The 2009 Due Process Decision**

Millay filed the due process hearing request that underlies this proceeding on January 13, 2009. (Admin. R., Vol. I, 1.) The matter proceeded through six days of hearing in March and April of 2009. Hearing Officer Rebeka Smith issued her decision on June 4, 2009. Ms. Millay filed her petition for judicial review on September 2, 2009. The record before the Court on the

---

[8]      On April 17, 2009, I informed the MDOE that the Court in no way considered MDOE a party to the proceedings, but that its role in the mediation was to be available to assist in any way it deems advisable toward resolution of the dispute between the parties. (Report of Tel. Conf., Case 07-178, Doc. No. 88.)

merits issue consists of 25 volumes of documents. Included in these volumes are the hearing transcript for Hearing Officer Stewart's 2008 due process hearing (Vols. XVI—XXIII), a transcript of Hearing Officer Smith's 2009 due process hearing (Vols. XXIII—XXV & March 22, 2010, Tr. Supp., Doc. No. 44), a supplemental affidavit submitted by Joanne Millay to conclude her testimony (Vol. III, 503-508), and the CD audio recordings already described.

In addition to the documentary evidence, Hearing Officer Smith had the benefit of sworn testimony from multiple witnesses. Among these were Dr. Grueneich, Dr. Pawletko, Dr. Talbot-Fox, two UCP case workers and a UCP case manager, Jeffrey Jones of the Division for the Blind, and, of course, Joanne Millay and Surry/School Union 92 personnel Melissa Beckwith, Superintendent Boothby, Principal Ehrlenbach, and Lynn Maddocks, and also School Union 98 (MDI) Director of Special Services, Kelley Sanborn. (Admin. R., Vol. III, 583.)

Hearing Officer Smith framed two issues for decision: (1) whether Surry violated state or federal special education law by failing to provide Y.M. with a free appropriate public education during the summer of 2008 or the 2008-2009 school year and (2) if so, what the proper remedy would be. (Id. 586.) The Hearing Officer premised her discussion on 43 findings of fact. Many of those findings relate the discussions among team members during IEPT meetings. The Hearing Officer's account of those proceedings is consistent with the one already set out above, based on my independent review of the audio recordings of the meetings, and will not be recounted again, except to note her observations concerning key expert testimony. The Hearing Officer's material findings are the following:

6.      The student has not been in an educational setting or accessed services in
her IEP since September 2006. (Testimony of Parent.)

. . .

9.      In September 2007, the school department hired a special education teacher (Rebecca York) and an educational technician . . . to work with the student and provided them with significant training, including multiple trips to Perkins School for programs and conferences.  (Testimony of Beckwith; Pawletko; Gurdonyi; S. 2246-48.)  The school department would have utilized Ms. York as the student's teacher if the student had been placed in any local placement and also anticipated that if she were placed outside the district, the accepting school could hire Ms. York as a teacher well-trained to work with the student.  At the time of hearing, the school department continued to employ Ms. York in anticipation of the student's return to an educational program. (Testimony of Beckwith.)

. . .

16.      At the April 9 meeting, Royal Grueneich, Ph.D., described the neuropsychological evaluation that he had conducted in September 2007.  (S. 1139-40.)  In his report, Dr. Grueneich noted that, as reported by the parent, the student sometimes exhibited physical forms of aggression when upset, such as pushing someone's hand away, but did not deliberately attempt to hurt others and that the student infrequently exhibited self-injurious behaviors.  (S. A-37.)  Dr. Grueneich reported to the Team that the student did not respond well to pressure and that she might deteriorate when pressured.  (S. 1139.)

17.      In his report, Dr. Grueneich also noted the student's history of behavioral difficulties in school, particularly with respect to avoidant and self-injurious behaviors, and recommended that the student be offered a safe space of her own to retreat to when upset.  In addition, he suggested that staff establish a daily routine and be prepared to take immediate steps if the student began to exhibit self-injury, such as allowing her to retreat to a safe space and using a gentle restraint if necessary.  Dr. Grueneich suggested that goals for reducing aggressive and self-injurious behavior should be a central component of her behavior plan. Dr. Grueneich noted that it would be essential for staff working with the student to be well-trained and highly consistent with respect to management of her behavior.  Dr. Grueneich found that the student's overall level of adaptive behavior skills, including communication, daily living, socialization, and motor skills, fell in the severely impaired range, with an average age equivalent of twenty-two months (the student's 2005 evaluation had assessed her overall adaptive behavioral skills to be at the twenty-month level).  Dr. Grueneich opined that the student would require psychology services on a consulting basis to help develop and monitor a behavior plan.  He also recommended nonacademic opportunities for mainstreaming.  (S. A-36 to A-44.)

18.      Also at the April 9 team meeting, Mark Hammond, M.A., CCC-SLP, reviewed the augmentative communication evaluation of the student he had performed in September 2007.  He recommended that a specialist skilled in

Applied Behavior Analysis be thoroughly involved in the student's program to analyze behavior effectively and regularly.  (S. 1140.)  In his report, Mr. Hammond found that the student utilized a variety of strategies in an attempt to gain access to desirable items, reject items that were nondesirable, and control her environment.  Mr. Hammond observed that the student utilized limited signs, vocalizations, words, word approximations, and gestures to communicate.  Mr. Hammond noted that the previous evaluation found that the student's receptive language age was less than one year.  (S. A-30 to A-38.)

19.     At the IEP Team meeting, Mr. Hammond recommended that the Team have a kingpin with strong behavioral experience overseeing the behavioral part of her program, who would get input from a consultant with deaf-blind expertise.  Team members discussed the need for significant training of staff, consistent staffing, and on-site consultations.  Dr. Grueneich noted that he was not skilled at detailed behavioral programming and it was observed that Dr. Talbot-Fox, even if she were available, was too far away to do hands-on training and consultation.  Dr. Grueneich also opined that it would be useful to have the whole consultant package available at one location.  (S. 1140-42.)

. . .

21.     At the April 10 IEP Team meeting, Mary Talbot-Fox, Ph.D., of Perkins School reviewed her November 2007 psychological evaluation of the student.  (S. 1144.)  In her report, Dr. Talbot-Fox noted that the student demonstrated agitated behavior during the evaluation and engaged in self-hitting and attempted aggression.  Dr. Talbot-Fox concluded that the student demonstrated developmental skills that ranged from the eighteen-month level to slightly above the two-year level.  Based on prior evaluations, the student was slowly expanding her skills, including being able to make more verbal requests and developing more social interaction and verbal request skills.  Dr. Talbot-Fox noted that behavioral challenges continued to impact the student's learning and functioning in a significant way.  The student's scores on behavior scales indicated that she required support in the range of the maximum level.  Dr. Talbot-Fox emphasized that the student's behaviors should not be permitted to allow her to get out of school early, which would cause negative reinforcement.  (S. A-332 to A-333; S. A-341.)

22.     In her report, Dr. Talbot-Fox noted that the parent had reported that on a typical day at home, the student would average one behavioral episode per day, which could be ameliorated by calming strategies such as allowing her to rock in her boat or listen to music.  The student received "clinically significant" and "elevated" scores on portions of an index of maladaptive behaviors.  Specifically, the parent reported that the student engaged in self-injurious behavior of hitting or biting herself or banging her head one to six times a week in a very serious manner.  The parent also rated the student's aggressive behavior toward others,

primarily scratching and pinching, as-one to six times a week and the severity as very serious. Likewise, the parent rated the student's tendency to throw objects as occurring one to six times per week and being very serious. (S. A-335 to A-336).

23.      Dr. Talbot-Fox recommended that the student attend a program that would be appropriate for the next several years, specifically a program for adolescents with developmental disabilities and behavioral challenges. Dr. Talbot-Fox recommended that a behavioral consultant, who could be available for regular on-site observation and Team consultation, should help establish the student's daily schedule; oversee the day-to-day implementation of her program; recommend the design of an appropriate calming space for the student; and develop an initial plan for staff to respond to the student's self-injurious or aggressive behaviors. (Testimony of Talbot-Fox; S. A-338.) Dr. Talbot-Fox believed that the psychologist would need to be available for consultation on a weekly basis after the first few weeks, during which consultation might need to occur nearly daily, but declined to opine on whether the psychologist would need to be on-site. Dr. Talbot-Fox testified that she would triage the student's needs as, first, behavioral; second, developmental disabilities and communication techniques for the blind; and, third, autism. She suggested that all the experts involved should have regular dialogue. (Testimony of Talbot-Fox; S. 1145-46.) Dr. Talbot-Fox noted that the student would benefit from interaction with students with disabilities, such as taking turns or sharing snacks, and then graduate to interaction with non-disabled peers. (S. A-339.)

. . .

33.      Mr. Anderson, Educational Supervisor at KidsPeace, stated that he felt that KidsPeace could develop a program for the student that would meet her needs in an appropriate, safe, and supportive placement. (S. 1154.) KidsPeace provides psychological services and behavioral consultants on staff as well as staff that is extensively trained in behavioral interventions. KidsPeace operates a program for students with emotional disabilities and a smaller program for students with autism. The school department had arranged for KidsPeace to move a two-room modular building next to the building currently housing the autism program. KidsPeace would then have utilized one room in the modular for some of its lower-level-skilled autism students, where the student would attend regularly, and the other room would be used as a quiet and safe space for the student to be used as necessary. (Testimony of Boothby; Beckwith; Maddocks.)

. . .

38.     . . . [At the July 2008 IEP Team meeting] Dr. Tracy Luiselli, the Outreach Consultant at Perkins School and a new Team member, opined at the meeting that the student's staff would require intensive, daily training in order to meet the student's needs at the Start of the program and that there should be coaching for

the staff in the classroom.  She noted that her organization could not provide on-going weekly training, much less daily training.  She believed that the student's staff would require intensive, ongoing training over several years.  (S. 1113.)

40.     In the summer of 2008, the school department contracted with Terese Pawletko, M.S., Ph.D., to provide psychological/behavioral services to the student's Team.  Dr. Pawletko specializes in working with children with autism spectrum disorders and visual impairments.  (Testimony of Pawletko.)  In the fall of 2008, the school department contracted with Dr. Susan Bruce, a consultant in deaf-blind instruction from Boston College.  (Testimony of Beckwith.)  Ultimately, the school department identified Margaret Fernald, Ph.D., (a local psychologist) as the kingpin, with assistance from Dr. Pawletko, Dr. Talbot-Fox, and Dr. Bruce.  Ms. Beckwith continued to be concerned that Dr. Fernald would not have sufficient availability to guide the Team adequately.  (Testimony of Beckwith.)

41.     [Following the stay put order of October 2008]  The school department prepared a classroom at Surry Elementary School and clinical members of the student's team also met with teaching staff to address the structure of the room and program delivery.  (S. 1041;  S. 1080.)

A review of the record citations offered by the Hearing Officer indicates that there is reliable evidentiary support for each of her factual findings.

The Hearing Officer addressed Ms. Millay's allegations of both procedural and substantive violations of the IDEA.  On these issues, she concluded as follows:

1.      *Levels of psychological/behavioral support services and use of a psychological and behavioral expert as the "kingpin."*

On this issue the Hearing Officer concluded that the record adequately supported the finding that Y.M.'s "multiple disabilities are best addressed by experts with a primary focus on behavior, followed by developmental disabilities, then autism."  (Id. 604-605.)  The Hearing Officer explained:

The school department reasonably relied upon the evaluations of multiple Team experts that the student's Team required a leader with expertise in psychological/ behavioral services who could spearhead the program, train staff, and be readily available to assist staff in interpreting and responding to the student's behavior. Although some Team members felt that psychological/behavioral services could

48

be provided at a less intense level, all Team members generally supported the idea of a kingpin behavioral expert providing services and none was available to undertake this role. The student's behavioral plan, focusing on communication systems, appropriately recognizes the communicative intent of much of the student's behavior, and suggests that efforts to teach the student alternative methods to meet her communication needs would lead to significant reductions in aggressive and self-abuse behaviors.

(Id. 605, citation omitted.) Because the IEP ensured an appropriate level of psychological/ behavioral services, the Hearing Officer concluded that Surry "met its IDEA obligation to provide support services that will allow the student to benefit educationally from her instruction." (Id. 606.)

>    2.    *Placement*

The Hearing Officer began by observing the "close link" between Millay's objection to the level of psychological/behavioral services in the IEP and her objection to the placement determination. (Id. 606.) She recognized that not only Millay, but also Dr. Talbot-Fox, Dr. Grueneich, Elesia Moore, and Jeff Jones felt that Y.M. could succeed in a public school setting. She also recognized the concerns voiced by Millay, Jones, and UCP caseworker Zsuzsanna Gurdonyi, that KidsPeace may present a safety concern because it separately houses programs for children with emotional issues. However, she sided with a countervailing argument that the only reliable local placement with adequate space and wrap-around support services would be KidsPeace, and agreed that a sufficient local public program was not available given the call for a behaviorist to put a substantial amount of time into the initial set up and training and to be essentially on call during an indeterminate period of program development. In her words:

Knowing from experience that it would be very difficult to contract with any individual to serve such a significant role, and understanding that the experts already involved had demurred when asked if they could provide such a service, the school was justified in seeking a placement where such a provider would be available on-site.

(Id. 609.)  The Hearing Officer also disagreed with Millay's contention that placement at KidsPeace would mean that Y.M. would receive an autism-focused program, and amount to isolation, explaining that the IEP services catered specifically to Y.M.'s personal needs, that the availability of private space was specifically recommended by several experts, and that isolation would be precluded by the presence and participation of certain students from the adjoining autism program.  (Id.)  The Hearing Officer was not impressed that a significant safety concern was presented by this placement, given the separation between the autism program and the program(s) for children with emotional difficulties.  (Id.)  She allowed that local high schools, including Mount Desert Island High School, would have significant difficulty delivering the services called for in Y.M.'s IEP given the personnel in place and the difficulty supplying psychological/behavioral consultative services on an as needed basis.  (Id. 610.)  Hearing Officer Smith also found that Mount Desert Island High School refused Y.M.'s enrollment, based on an assessment that its life skills program could not adequately meet Y.M.'s needs.  (Id.)

The Hearing Officer made a point of finding that Surry explored the possibility of a Mount Desert Island placement, as requested by Millay, and also that it sought enrollment at the Bangor High School as early as November 2007, but that the request was stymied based on regional restrictions until the MDOE became involved in court-sponsored mediation.  (Id. 611.) In the Hearing Officer's assessment:  "By offering KidsPeace as an alternative to a residential placement, the school department met its obligation to identify a placement where the student's program could most likely be implemented to allow the student to make demonstrable improvement in her areas of special needs."  (Id.)

3. *Procedural Issues*

The Hearing Officer addressed five procedural challenges as well. In her assessment, none of the challenges rose to the level of threatening a violation of any substantive guarantee and, accordingly, were treated as insufficient to justify any remedy. (Id. 611-617.) First, the Hearing Officer concluded that substantive rights were not overridden when the issue of placement was determined without input from consulting providers of deaf-blind or psychological services and without input from Ms. York, the designated teacher. (Id. 612-13.) Second, the Hearing Officer concluded that Surry's refusal to amend meeting minutes from the July 2008 meeting to conform to Millay's specifications was not a serious issue, as a review of the audio recordings reflected that the minutes were not inaccurate or misleading. (Id. 613.) Third, the Hearing Officer rejected Millay's contention that Surry had suppressed open dialogue and not sought meaningful input from the team members. (Id. 614.) Fourth, the Hearing Officer found that the family's substantive rights were not violated based on the December team meeting that Millay could not attend, because there was a legitimate scheduling difficulty and a meaningful offer of a follow-up session was extended to Millay. (Id. 614-17.) Fifth, she rejected Millay's contention that the KidsPeace placement was not actually available for Y.M., even if Millay had agreed to it. (Id. 617.)

4. *Transitional programming*

Finally, the Hearing Officer addressed Millay's contention that the transition (reintegration) plan relied too heavily on UCP staff and Millay's home to qualify as a school-sponsored ESY program. After acknowledging that there was no dispute about the need for ESY services, the Hearing Officer found that the two-month plan was appropriate and that, with a two-month transition plan in place, "it was not possible for another ESY program to be

51

accomplished during the summer of 2008." (Id. 619.)  The Hearing Officer also found that the final plan removed Millay's home as a service location, but that Millay nevertheless refused to cooperate with its implementation.  The Hearing Officer concluded that Surry "did not fail to provide the student with appropriate ESY services for the summer of 2008 when it designated, with the Team's agreement, the student's ESY services to be the implementation of her transition plan, with the goal of introducing her to full implementation of her 2008-2009 IEP as soon as possible." (Id.)

## III.    DISCUSSION

Joanne Millay contends that the Hearing Officer erred and that Surry denied Y.M. a free appropriate public education from July 2008 through June 2009.  The primary thrusts of her challenge are that deaf-blind needs demand a different treatment modality than do autism needs, that Dr. Bruce indicated that she was skeptical of the autism label for Y.M., and that the behavioral assessment of Y.M. is overblown and Y.M. in fact has no need of psychological/ behavioral oversight under the kingpin model in order to develop a solid grounding for the delivery of meaningful educational services.  Assuming success on these issues, Millay's position is that a public high school in her area could deliver an appropriate IEP by relying on outside consultants for all special needs services beyond those delivered by special education staff.  (Pl.'s Mem. of Law, Doc. No. 49.)  The following discussion addresses all of these challenges and does its best to incorporate the related talking points Millay peppers throughout her lengthy briefs.  However, because the issue before the Court is whether the Hearing Officer erred in her findings and conclusions, the discussion is oriented to the Hearing Officer's findings and conclusions, rather than to Millay's alternative "proposed findings of fact." (Id. at 3-35.)

Before addressing these issues, it is necessary to describe the scope of judicial review and the standards that apply in an action arising under the IDEA. These are set forth in Part A. The soundness of the Hearing Officer's resolution is addressed in Part B.

**A.      Standards of Review**

The procedural task Congress has assigned to the courts in IDEA actions is to "receive" the record of the administrative proceedings, consider additional evidence offered by a party, and grant "appropriate" relief based on a preponderance of the evidence. 20 U.S.C. § 1415(i)(2)(C). That task has been interpreted as requiring the courts to review the administrative proceedings using a unique, intermediate standard of review that involves independent consideration of the evidence and an evaluation of the hearing officer's decision that is more vigorous than clear-error review, but less vigorous than *de novo* review. This standard tempers a court's authority to grant appropriate relief in recognition of the fact that judges generally lack specialization in education policy. Rowley, 458 U.S. at 206-208; Lenn v. Portland Sch. Comm., 998 F.2d 1083, 1086-87 (1st Cir. 1993). When a hearing officer's decision rests on a matter of educational policy, it is presumed to arise from specialized knowledge, and is due a greater degree of deference. Lessard v. Wilton-Lyndeborough Coop. Sch. Dist., 518 F.3d 18, 24 (1st Cir. 2008).

With respect to mining the administrative record, the Court's review of the evidence is to be aided by the parties, particularly the complaining party, for "the burden rests with the complaining party to prove that the agency's decision was wrong." Roland M. v. Concord Sch. Comm., 910 F.2d 983, 991 (1st Cir. 1990). "In the end, the judicial function at the trial-court level is 'one of involved oversight,' and in the course of that oversight, the persuasiveness of a particular administrative finding, or the lack thereof, is likely to tell the tale." Lenn, 998 F.2d at 1087 (quoting Roland M., 910 F.2d at 989)). In this process, "the administrative proceedings

must be accorded due weight," and the Court will not be "at liberty either to turn a blind eye to administrative findings or to discard them without sound reason." Id. (quoting Rowley, 458 U.S. at 206). "Judges are not trained pedagogues, and they must accord deference to the state agency's application of its specialized knowledge." Lessard, 518 F.3d at 24.

Programming decisions made pursuant to the IEP are evaluated for compliance with three key factors. First, the IDEA indicates that disabled students should ordinarily receive educational programming alongside non-disabled students, at least where appropriate. This factor is balanced against the second, which is that the school system is expected to devise and be prepared to deliver programming that offers a reasonable likelihood of education benefit for the child in question. Third, the IDEA sets out procedural guidelines for schools to follow in regard to assessing the child's needs and how to program to them. Ideally, adherence to the procedural guidelines will result in programming acceptable to both the family and the school. If not, then it should at least provide an adequate record against which the school's programming decisions can be measured.

      *1.    Balancing least restrictive environment (LRE) and the likelihood of educational benefit*

Pursuant to the IDEA:

> To the maximum extent appropriate, children with disabilities, including children in public or private institutions or other care facilities, are educated with children who are not disabled, and special classes, separate schooling, or other removal of children with disabilities from the regular educational environment occurs only when the nature or severity of the disability of a child is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily.

20 U.S.C. § 1412(a)(5)(A). Generally speaking: "The least restrictive environment is the one that, to the greatest extent possible, satisfactorily educates disabled children together with

children who are not disabled, in the same school the disabled child would attend if the child were not disabled." Carlisle Area Sch. v. Scott P., 62 F.3d 520, 535 (3d Cir. 1995). Consideration of the least restrictive environment is a necessity, for "[m]ainstreaming may not be ignored, even to fulfill substantive educational criteria." Roland M., 910 F.2d at 992-93. Although the least restrictive environment must be considered in all special education programming decisions, Congress recognized that the least restrictive environment—the default standard curriculum—does not provide meaningful educational benefit to many children with disabilities. The essential objective of the IDEA is to encourage the states, through federal funding mechanisms, to develop individual educational programming for disabled students. According to the Supreme Court, at the time of the IDEA's passage, in the 1970s, "the majority of disabled children in America were 'either totally excluded from schools or sitting idly in regular classrooms awaiting the time when they were old enough to drop out.'" Schaffer v. Weast, 546 U.S. 49, 52 (2005) (quoting H. R. Rep. No. 94-332, p.2 (1975)).

The schools are tasked with developing a "free appropriate public education" program that balances mainstreaming objectives with the goal of providing meaningful educational benefit. 20 U.S.C. § 1412(a)(1)(A). However, the demand for educational benefit does not always jibe with the mainstream expectation. It is routinely observed that the two, often competing factors present a "continuum of educational possibilities," Roland M., 910 F.2d at 993, but not every possible programming option on this continuum falls within the reasonable or practical range of options. Both overly inclusive programs and overly specialized programs can raise legitimate objections. In order "to determine a particular child's place on the continuum, the desirability of mainstreaming must be weighed in concert with the Act's mandate for educational improvement." Id.

Typically, IDEA cases present claims by families who want the school system to provide more services than are being supplied. In this context, the IDEA merely states that it "establishes a basic floor of education" for children with disabilities. 20 U.S.C. § 1412(a)(1)(A). This reflects that the schools need not provide the optimal or ideal program to special education students. Lessard, 518 F.3d at 23. By law, a school system need provide only a program "reasonably calculated" to deliver "educational benefit." Rowley, 458 U.S. at 207; Lessard, 518 F.3d at 27. The purpose of the IDEA is "more to open the door of public education to handicapped children on appropriate terms than to guarantee any particular level of education once inside." Rowley, 458 U.S. at 192. In sum: "the substance of an IEP must be something different than the normal school curriculum and something more than a generic, one-size-fits-all program for children with special needs." Lessard, 518 F.3d at 23. Ordinarily, this will occur within the local public school system, "except where the resources of those schools cannot appropriately meet the children's needs." Amann v. Stow Sch. Sys., 982 F.2d 644, 650 (1st Cir. 1992) (citation omitted). The "alchemy" behind this balancing act "necessarily involves choices among educational policies and theories—choices which courts, relatively speaking, are poorly equipped to make." Roland M., 910 F.2d at 992.

2.      *The process and data behind programming*

"The development of an IEP is meant to be a collaborative process." C.G. v. Five Town Cmty. Sch. Dist., 513 F.3d 279, 285 (1st Cir. 2008). The IEP Team is gathered and convened to develop the IEP, relying on the collective expertise and perspectives of all team members. Id. In addition to teachers and administrators with related training and experience, parents are counted as important team members with relevant knowledge concerning the student's disabilities and needs. In addition, outside consultants may round out a team when their expertise and

knowledge concerning the student and her disability exceed that of the other team members or are otherwise beneficial to the decision-making process.  Id. (citing 20 U.S.C. § 1414(d)(1)(B)). The IDEA specifies that "the determination of . . . the educational needs of the child shall be made by a team of qualified professionals and the parent of the child." 20 U.S.C. § 1414(b)(4)(A).

Recognizing the importance of team members, the IDEA places some constraints on whether, or when, a given team member can be absent from an IEPT meeting.  For instance, absent the consent of both the parent and the school district, a team member cannot be excused from a meeting at which his or her area of the curriculum or related services is discussed or modified unless that member submits in writing "input into the development of the IEP prior to the meeting."  Id. § 1414(d)(1)(C);  34 C.F.R. § 300.321(e)(2).  The significance of individual assessments by qualified professionals is also highlighted in the requirement that the school district "shall ensure that . . . assessments and other evaluation materials used to assess a child . . . are used for purposes for which the assessments or measures are valid and reliable."  20 U.S.C. § 1414(b)(3)(A)(iii).  The IDEA clearly places the onus on the school system to take the steps necessary to develop and update an IEP and to obtain the data needed to determine the special education needs of the student.  Id. § 1414(c)(2) ("The local educational agency shall administer such assessments and other evaluation measures as may be needed to produce the data . . . .").

Of course, while collaboration is the goal, the law recognizes that there will not always be consensus.  Where consensus cannot be reached, "the IDEA confers primary responsibility upon state and local educational agencies to choose among competing pedagogical methodologies and to select the method most suitable to a particular child's needs."  Lessard, 518

F.3d at 28.  This responsibility has implication for judicial review.  Because courts lack the expertise involved in special education programming, "once a court determines that the requirements of the [IDEA] have been met, questions of methodology are for resolution by the States."  Rowley, 458 U.S. at 208.  "The short of it is that courts are entrusted with ascertaining the adequacy of an IEP's educational components but not with weighing the comparative merit of the components when stacked against other heuristic methods."  Lessard, 518 F.3d at 29.

Lastly, it is essential to keep in mind that not every procedural irregularity will overturn the apple cart.  "Before an IEP is set aside, there must be some rational basis to believe that procedural inadequacies compromised the pupil's right to an appropriate education, seriously hampered the parents' opportunity to participate in the formulation process, or caused a deprivation of educational benefits."  Roland M., 910 F.2d at 994.  As the First Circuit has aptly stated:  "Congress' special emphasis on the provision of procedural protections springs from the hope that an abundance of process and parental involvement will help ensure the creation of satisfactory IEPs acceptable to all concerned."  Id. at 995.  This case has involved an abundance of both process and parental involvement, yet consensus remained out of reach.  That does not mean that Surry violated Y.M.'s right to a free appropriate public education for the 2008-2009 school year.  With these basic precepts in mind, I turn to the merits.

**B.     The Merits**

The briefing cycle called upon Joanne Millay to submit the initial brief, Surry to submit its solitary brief thereafter, and Millay to submit a reply brief.  (Sch. Order, Doc. No. 24.)  Millay's brief raises a number of challenges to the Hearing Officer's decision.  Millay seeks a declaration that Surry denied Y.M. a free appropriate public education from July 2008 through June 2009 and, in addition to compensatory educational services for Y.M., Millay seeks

reimbursement of costs for her "professional time utilized to offset the effect of regression . . . and the material costs involved in the administrative hearing and subsequent federal court appeal." (Pl.'s Brief at 1, Doc. No. 49.) Millay challenges both the IEP and the placement decision. As for the IEP, she contends that Surry overemphasized behavioral concerns and has developed a more intensive behavioral program than is needed, allegedly in order to rule out having to serve Y.M. in a local public school setting. She also maintains that Y.M. is not autistic and, therefore, should not receive any programming oriented toward autism. These positions inform Millay's argument on placement. Absent the behavioral services and the autism label, she contends, it would naturally follow that Y.M. would be educated in a local public high school life skills program and that a day treatment autism program would be out of the question. This is the heart of Millay's challenge. Because these arguments blend the IEP and placement issues, I discuss both concerns in the context of each particular challenge, rather than attempting to parse the IEP and placement pieces for purposes of discussion. In the course of this discussion, I also address Millay's complaints about deaf-blind expert utilization (or underutilization), and about the level of record support for the availability of the KidsPeace placement, the primary "procedural" challenges advanced by Millay in her primary brief.

1.    *The Autism label*

With respect to Y.M.'s disabilities, Millay describes them as "includ[ing] total blindness, partial loss of hearing, a seizure disorder (well managed by medication) and delays in development." (Pl.'s Brief at 5.) Millay emphasizes the opinion expressed by Dr. Susan Bruce, an expert in the field of deaf-blindness, who has explained that the communicative limitations of deaf-blindness "result in behaviors that are commonly mistaken for autism, although these disabilities have a distinct etiology and very divergent educational protocol." (Id.) This

challenge is easily resolved.  As the Hearing Officer found, Y.M. has received professional

evaluations from not only Dr. Grueneich, but also from Dr. Talbot-Fox, who works within the

Perkins School for the Blind, both of whom agreed that Y.M.'s developmental challenges include

a measure of autism (as well as severe mental retardation[9]).  Dr. Grueneich testified that certainly

all areas, including autism, need to be addressed.  (Admin. R., Vol. XXV, 5570, Tr. at 1109

(5570, 1109)[10].)  The Hearing Officer was entitled to rely on their professional judgment with

respect to the question of whether or not autism is among the disabilities that color Y.M.'s

educational picture.

In any event, the autism dispute is something of a red herring.  The idea is that, but for

the presence of an autism disorder, the KidsPeace placement would be out of the question.

However, as the Hearing Officer also found, Surry did not place Y.M. at KidsPeace so that she

could receive an educational program designed for autistic students.  There is no question but

that Y.M.'s IEP describes an individualized program designed to serve her unique needs.  It

certainly does not simply describe a need for autism programming.  Thus, when Millay states

that Y.M. "has consistently presented, across time and evaluators, as a student whose disability

of deaf-blindness and concomitant developmental delays cause her to experience frustration due

to ongoing failures of communication rather than from a separate and distinct etiology," she is

not describing a phenomenon that the Hearing Officer or the IEP team failed to appreciate.  (Pl.'s

Brief at 6.)  The IEP describes Y.M.'s present levels of academic and functional performance and

properly describes a profound limitation in receptive and expressive communication skills and

---

[9]      Ms. Millay's description of Y.M. does not mention severe mental retardation, either, but uses the more ambiguous concept of developmental delay.  It is not clear whether she means to deny the existence of any cognitive deficit stemming from an underlying neurological/physical impairment.

[10]      Where the hearing transcript is cited, two page numbers are referenced because the transcript is condensed. The first page number corresponds with the sequential pagination of the record volumes.  The second page number corresponds with the condensed transcript page.

acknowledges the "broad agreement" that challenging behaviors are a form of communication. (Admin. R., Vol. VI, 1310.)  The Hearing Officer clearly had a solid evidentiary basis for finding that the IEP did not call for an autism program.  Dr. Talbot-Fox testified that Y.M.'s program should afford behavioral expertise, expertise in mental retardation, expertise in communication disorders, expertise in autism (though of tertiary rather than primary significance), and consultative expertise in blind education.  (Id. 5425, 664-65.)  Dr. Pawletko offered the same assessment.  (Id. 5493-94, 865-66.)  The Hearing Officer accepted these views, and appropriately so.

### 2.    *Behavioral programming*

Ms. Millay relies on hearing testimony from Dr. Pawletko, Dr. Talbot-Fox, Dr. Grueneich, and Jeff Jones in support of her challenge to the level of behavioral services needed to deliver adequate educational programming.  In addition to these individuals, Millay also relies heavily on her own testimony and the testimony of UCP workers who spent the most amount of time with Y.M., albeit in the context of something other than a school program.  All of this testimony cannot be related here.  I have reproduced some of the expert testimony here, as it was the testimony of greatest weight in the record.

On the behavioral front, Dr. Talbot-Fox testified that a psychologist with a behavioral background (a "behavioral specialist," in her words) would be necessary to structure Y.M.'s program from the start and to assist with transitioning to the school setting, but that, once the transition was made and the program was structured, Y.M. could "function in a place that did not have a psychologist on site."  (Id., Vol. XXIV, 5423, Tr. at 656.)  However, once all of the preliminary work was accomplished, Dr. Talbot-Fox suggested that Y.M. should remain in her program for "a few years," to avoid any short-term disruption.  (Id. 5422, 653.)  Dr. Talbot-Fox

described Y.M.'s behavior in manageable terms.  In her view, Y.M. had made some progress in her home and community based setting, but she acknowledged that Y.M.'s behavioral difficulties relate primarily to task avoidance.  (Id. 5422, 652.)  Dr. Talbot-Fox testified that the services contained in the IEP provided a reasonable approach to starting the school year.  (Id. 5423, 658.)  She also allowed that behavioral services would need to continue after the program was set up, so that there could be at least weekly "face-to-face" consultation and observation, for another period of time.  (Id. 5424, 661-62.)  Her expectation was that there would be "a lot of work behaviorally" at the start, and that the need for onsite expertise would depend "on what problems she presents with."  (Id. 5425, 667.)  While Dr. Talbot-Fox felt that Y.M.'s behaviors were mostly manageable when she attended Perkins, she also conceded that one of the advantages of the Perkins program was that it has a team available that can consult and advise the teachers who deliver the educational services.  (Id. 5426, 668.)

Dr. Pawletko offered a similar assessment.  She indicated that, given Y.M.'s history and the long absence from any structured educational program, that there are vulnerabilities and a need for caution in terms of reintegration, transition, and behaviors.  (Id. 5493, 862.)  She opined that Y.M.'s program would have to include a behavioral component that is "pretty substantial."  In her own professional experience as a consultant, she found that even fairly experienced personnel on the "front lines" often needed a level of support to process things on a fairly regular basis, sometimes daily.  (Id. 5493, 863.)  She described as a major concern that Y.M. not be reinforced in negative behaviors, which can easily happen if a front line provider permits Y.M. to "escape" a particular learning event.  She indicated that "if somebody is not there to work with the front line people" on interpreting behavioral communication and even participating directly at times, "the whole program can collapse and you can actually lose more ground rather than

advancing and moving forward in terms of the skills."  (<u>Id.</u> 5493, 864-65;  <u>see</u> <u>also</u> 5494, 868-

69.)  As for the "long-term" aspect of placement, Dr. Pawletko said that she could not speak to

how long at this point, and that the emphasis was on program development in a location where a

comprehensive team approach would be most likely.  (<u>Id.</u> 5500, 892.)  She thought it might take

two years for Y.M. to settle in to a program, but stated that it would depend on the development

of relationships rather than any arbitrary time period.  (<u>Id.</u> 5502, 898-99.)

   Despite Dr. Pawletko's testimony in support of having a behavioral specialist in place for

intervention and programmatic structure services, Millay attempts to cast aspersions on the

appropriateness of KidsPeace because Dr. Pawletko expressed a personal preference for a "social

pragmatic approach" over the ABA approach that KidsPeace uses with other students, which

Pawletko characterized as "too restrictive and . . . not generalizable."  (<u>Id.</u> 5507, 920-21.)

However, Dr. Pawletko indicated that KidsPeace would still be suited to provide the behavioral

support for the front line teaching staff without delivering an ABA program.  (<u>Id.</u> 5507, 921.)

   On this issue, the Hearing Officer permissibly concluded that it was appropriate for the

IEP to call for a behavioral specialist to "spearhead" the program to ensure consistency in

programming, educate staff in proper responses to avoidance behaviors, coordinate the multiple

consultative services needed to avoid conflicting recommendations from multiple consultants,

and provide onsite, back up support for the special education teacher who would be directly

interfacing with Y.M. on a daily basis and would require stand ins from time to time.  The record

supplies multiple expert assessments on these points, including input provided by Dr. Pawletko,

Dr. Talbot-Fox, Dr. Artesani, Mark Hammond, and others.  It cannot be said that the Hearing

Officer did not have discretion to accept this model of programming or that her decision to

accept the behavioral services as needed groundwork to enable Y.M. to benefit educationally

from her instruction was not a reasonable exercise of educational expertise, as compared with a legal, or even lay, assessment that the Court might be better, or equally, qualified to judge.

3.       "Wrap-around" services and least restrictive environment

Dr. Talbot-Fox felt that Y.M. could obtain meaningful programming in "a public school" through a consultative service model. (Id. 5426, 671.) Her concern with the KidsPeace placement was that she did not know the level of disturbances that Y.M. might be exposed to. She did not think Y.M. would benefit from a program if she were exposed to worse behaviors than her own. (Id. 5426, 671.) On the other hand, Dr. Pawletko testified that attempting to provide Y.M.'s program in a public school setting, such as Surry Elementary, would not be advisable, if it would lack the onsite behavioral expertise and backup. (Id. 5494-95, 869-70.) In her experience, she does not "see this complexity of youngster typically in a public school setting where there's this cluster of expertise in a particular location." (Id. 5495, 871; see also 5495, 873.) Certainly the past consensual attempt to transfer Y.M.'s program to the Perkins School is supportive of this perspective.

In response to a representation from Ms. Millay that Dr. Grueneich and Dr. Talbot-Fox recommended public school placement, Dr. Pawletko allowed that she would agree, "if they recommended public school placement within the context of a comprehensive, cohesive, on site team," but otherwise, her opinion was that "a traditional public school would be difficult without that component in terms of the behavioral and social communication support [and] . . . the deaf-blind piece that a youngster like [Y.M.] would need." (Id. 5503-5504, 905-906.) She felt that exposure to loud outbursts presented a concern, but noted that Surry was proposing a defined space within the autism program, which is itself separated from KidsPeace programming for

emotionally disturbed children.  (<u>Id.</u> 5508, 923-24.)  She did not feel that anyone was proposing that Y.M. be placed in a classroom with behaviorally challenged classmates.  (<u>Id.</u>)

Dr. Grueneich testified that he had felt that it would be "possible to provide an appropriate program in a public school setting" (Admin. R., Vol. XXV, 5568-67, 1102-103) and that Y.M. had demonstrated in the past an ability to be successful in that setting (<u>id.</u>, 5569, 1105.)  As for exposure to students with emotional disabilities, Dr. Grueneich stated, like everyone else, that Y.M. should not be placed in a program designed for such students, but that it would not necessarily be bad if there were some contact.  (<u>Id.</u> 5570, 1108.)  He agreed with the idea that Y.M. should have some contact with students who do not have emotional disturbance or "severe autism."  (<u>Id.</u>)  He also stated that, if a placement would preclude exposure to typically developed children, it would impose a greater restriction than is necessary.  (<u>Id.</u> 5571, 1114.)  Dr. Grueneich's testimony included, however, a review of statements he had previously made in team meetings, including his agreement about the advisability of the kingpin model, the need for the person serving that role to have behavioral expertise, and prior testimony to the effect that Y.M. would need her own space in her school program.  (<u>Id.</u> 5573-74, 1120-1123.)

Jeff Jones was unqualifiedly the strongest proponent of a public school placement for Y.M.  In various roles within the Bureau of Rehabilitation, Division for the Blind, he has supplied consultative services to many blind students in Maine over a 35-year period and has been involved with Y.M.'s IEP team since Y.M. was three years old.  (<u>Id.</u> 5579, 1143.)  He indicated that there are "some" multi-handicapped, deaf-blind students in public high schools in Maine, and that it takes a lot of effort to put their educational programs together.  Usually, according to Mr. Jones, schools supply psychological services on a contract, consultative basis.  (<u>Id.</u> 5579, 1144-46.)  His view is that interaction with age-appropriate peers is vital and that this

should include some non-disabled peers, such as through a reverse mainstreaming model.  (Id. 5580, 1148.)  He also feels it would have been appropriate for Surry to ask a consultant from deaf-blind services to look at the proposed KidsPeace placement prior to any final decision on placement.  (Id. 5581, 1151.)  In his view, placement should provide "as much exposure in the real world environment, the mainstream of community environments . . . as possible."  (Id. 5582, 1157.)  Under examination by Attorney Herlan, on the other hand, Mr. Jones indicated that he had recommended Dr. Pawletko's involvement, had worked with her in the past, and considered her to have the kind of expertise needed to assist with Y.M.'s programming decisions.  (Id. 5583, 1159.)  He also allowed that her educational needs were especially complicated, due to severe cognitive disabilities.  (Id. 5583, 1161.)  Like others, his primary objection to KidsPeace was that he had concerns about the types of behaviors Y.M. might be exposed to and the level of inclusion she would experience.  (Id. 5584, 1163-64.)  At the same time, however, Mr. Jones felt that no program would be particularly likely to succeed without availability and consistency from expert contacts, with regular involvement and a considerable amount of time invested by these individuals in the training of staff.  (Id. 5584, 1166.)  Mr. Jones also indicated that a day treatment model might serve as a suitable beginning or transition step, but felt that ultimately she should be placed within a more inclusive program.  (Id. 5585, 1169.)  He conceded the point that, even in a public school program, the majority of Y.M.'s peer activity would be with disabled peers rather than regular education students, though he felt that a small piece of mainstreaming would take place and provide consistent mainstream exposure over time.  (Id. 5586, 1171-74.)

The Hearing Officer made a fair and reasonable determination of this exceedingly difficult issue.  She recognized that a public school could theoretically have all of the supports in place to develop this IEP and that KidsPeace raised a potential concern because its primary focus

is on children with emotional disabilities. On the other hand, she also recognized that KidsPeace was better equipped to meet both the behavioral support services model and the space demands generated by Y.M.'s program. She assessed, based in part on her own experience, that delivery of the intensive behavioral support services needed to get this program started and structured would exceed any reasonable contract-consultative model, making it justifiable for Surry to look to KidsPeace to serve this specific need.

This case presents a good example of how difficult it can be to balance the demands of least restrictive environment and educational benefit in some cases. The Hearing Officer did not err in this instance because she carefully considered all of the material evidence and accepted what amounted to reasonable programming and placement determinations on the continuum of educational possibilities. Her decision that this approach was most likely to confer educational benefit upon Y.M. was a legitimate one and is adequately supported by the record and is also an exercise of educational expertise that the Court is not well suited to second guess. The Hearing Officer did not ignore mainstreaming. The experts all acknowledged that initial mainstreaming activity could be limited during the development stages of Y.M.'s program.[11]

Ms. Millay protests that Surry's placement decision meant that Y.M. would be isolated in a restrictive placement at KidsPeace for the remainder of her school years because various experts recommended that programming not change in the short term. (Pl.'s Br. at 24.) This "permanent isolation" hue and cry is far overblown. The team devised a demanding program to transition Y.M. from a highly variable, loosely structured home and community based day

---

[11]     Surry has cited cases that adequately demonstrate that a placement made outside of the neighborhood public school against the family's wishes is not an automatic violation of the IDEA. (Def.'s Br. at 18-22, citing, inter alia, G. v. Cranston Sch. Comm., 130 F.3d 481 (1st Cir. 1997) (per curiam).) I have not discussed these cases or attempted to exhaustively search out other exemplars because an issue like this is fact-intensive and the proper outcome cannot be predicted by precedent.

habilitation program to new special education staff who would be expected to deliver a structured educational program in a school setting. In addition to multiple other programming parameters, the program called for the eventual delivery on new augmentative communication systems that would, hopefully, expand Y.M.'s communicative horizons. It is perfectly reasonable to think that the foundation for this endeavor—which would place considerable demands on the primary teacher as well as on Y.M.—should be laid in a more structured and controlled ("distraction free") environment, especially in light of the behavioral recommendations voiced by multiple experts. This assessment did not mean that Y.M. would be forever isolated from meaningful mainstream opportunities. Peer relationships were proposed from the start and nothing in the IEP foreclosed the expansion of mainstream activities to typically-adjusted children once this foundation was built. More than one expert condoned this approach to mainstreaming. Dr. Talbot-Fox, for instance, recognized that peer interaction could be limited to students with disabilities at the start. Certainly spending the 2008-2009 school year in this placement with this program would not have amounted to isolation, let alone the "mental health" commitment that Millay, unhelpfully, describes it as. (Pl.'s Br. at 21-22.)

"At the start" might serve as the overarching theme of this programming decision. If there was one unifying theme expressed by all consultants on the team it was that a transition to an educational program needed to get started and that the program would need to develop in real time based on real developments and observation by and feedback from the core consultants (Drs. Bruce, Fernald, and Pawletko) and secondary service providers. Ms. Millay's briefing largely ignores this basic, pragmatic fact that the program was most likely to succeed if it had the opportunity to start and evolve in a sheltered and controlled setting. On the one hand, Millay portrays the KidsPeace proposal as wholly inadequate because the team meetings did not give

her a fully-rendered picture of just what Y.M.'s day-to-day experience would be, going so far as to say that she would pull Y.M. from any placement at the first presentation of any "behavior" by Y.M., even though the diagnostic picture essentially guaranteed that some behavioral episodes would arise. On the other hand, in her briefings to this Court Ms. Millay takes the perspective that Y.M. could make a transition to a life skills program virtually without incident, if only it were in a public high school. This double talk[12] defies credulity and weakens Millay's overall presentation considerably. As for the suggestion that she would pull Y.M. from any program if a "behavior" arose, the evidentiary record predicts behavioral episodes, particularly if any educational demands are presented, clearly making this attitude unacceptable. And as for the ease with which a transition might be made to a public school, assuming light educational programming, that personal opinion is outweighed by considerable evidence recommending a behavioral scaffold within which relatively demanding deaf-blind services, augmentative communication services, and other educational services could best be delivered. The Hearing Officer was not required to adopt the mother's optimistic assessment of how a public school placement would unfold in terms of delivering the educational component desired by the consultants when the record contained so much evidence in favor of the "wrap-around" and behavioral model as the initial delivery system.[13]

---

[12]        This is not the only incidence of double talk. In addition, Ms. Millay has suggested that two months for a transition/reintegration period is both wholly inadequate, if it involves transition to a placement she does not support, or virtually unnecessary, if it involves transition to a placement she does support.

[13]        The most recent activity in case 07-178 indicates that Ms. Millay has now withdrawn Y.M. from the Bangor High School program, representing to the Court that "[an] unlawful act by Bangor assistant special education director Patti Rappaport, who is now special education director, has since made that placement untenable." (Case No. 07-178, Doc. No. 182.) Notably, Millay also complains of inadequate staff training and difficulty that the staff is having understanding Y.M.'s communications. Although all of the details of the Bangor program are not currently before the Court to enable a proper comparison with the IEP and placement developed in 2008, let alone to evaluate Ms. Millay's allegation of unlawful acts, adequate training and careful development of the communication component of the program were two of the core concerns that informed Surry's decision to

Millay's other challenge to the behavioral approach in the IEP is that, in her view, it subjugates deaf-blind curriculum to a behaviorist-controlled system. Her position is that a deaf-blind curriculum would solve every behavioral problem and that an expert in deaf-blind education should have been in place from the start to determine essentially every programming and placement question in this case. There is no dispute that support from a deaf-blind education consultant is important to the development and delivery of a meaningful educational program for Y.M. What Millay appears to be asserting with this point is that this particular need required Surry to defer to a specialist in deaf-blind education on all questions of programming and placement, with only limited regard for the input of the psychologists, behavioral specialists, and other professionals on the team. She uses this argument, for instance, to weaken the persuasiveness of input from other professionals like Mark Hammond and also to support an argument that a specialist in deaf-blind education should have been asked to visit area schools to determine the issue of placement.

As far as the weight of expert opinion is concerned, it so happens that there is across the board agreement about the need for services that will address Y.M.'s blindness and moderate hearing loss. These are contemplated in the IEP and a contract was arranged for delivery of these services on a contract basis by Dr. Bruce. Ms. Millay's objections ring hollow with regard to the adequacy of Y.M.'s team. Since her participation in the Perkins program, Y.M.'s IEP team has benefited from the participation of Perkins staff, including the school's psychologist, Dr. Talbot-Fox, among others. In addition, the team has included Jeff Jones, of the Division for the Blind, and Maria Timberlake, of the Center for Community Inclusion. Dr. Pawletko, of course, has very significant and relevant experience with blind education. Finally, Dr. Bruce joined the

recommence Y.M.'s programming in a more stable environment to iron out these essential services and ensure adequate training of Y.M.'s proposed special education teacher.

team in time for IEP implementation, and the IEP left room for her to play a significant role in program development. Frankly, it is a shame that Ms. Millay did not allow this program to commence and do what she could to ensure its success. Had she done so, it is likely that Y.M. would by now have a program, including additional augmentative communication systems, that could travel with her to any placement and achieve more mainstream participation.

As for reliance upon a consulting expert to prescreen and choose the placement, Dr. Pawletko testified that it was not unreasonable to "rely on program descriptions in terms of the behavioral component that's available through KidsPeace as well as the fact that a separate situation was going to be set for [Y.M.]" (Admin. R., Vol. XXV, 5505, Tr. 912-13.) This testimony bolsters the Hearing Officer's conclusion about the KidsPeace placement. In any event, the IDEA does not mandate that a school district delegate to a consultant the responsibility of determining whether the school's own staff, programming, and available space are adequate to administer a program like the one in question here. On this issue, a representative of Mount Desert Island High School's special education program indicated that MDI's program was not adequately set up to administer the IEP. Representatives of the home school and district similarly communicated their inability to reliably supply services required by the IEP. The Hearing Officer, based in part on her own experience and expertise, appreciated these self-assessments and regarded them as honest and reliable. She also credited Surry with having looked out of district for an alternative public school placement, in an effort to fulfill one of Millay's programming demands. The Hearing Officer also considered that Y.M.'s educational advancement in the early years at Surry "was likely insufficient to qualify as a 'meaningful benefit.'" (Id., Vol. III, 606.) These collective considerations are an adequate basis for relieving

Surry of the burden of locating a nearby public placement given Y.M.'s complex needs and the high level of services called for in this particular IEP.

As for the adequacy, or existence, of the KidsPeace placement, the record is sufficient here, as well, to support the Hearing Officer's decision. Unlike the presentation made for the 2007-2008 school year, which was at issue in case number 07-178,[14] the presentation in this case includes participation at team meetings by a representative of KidsPeace and his assessment that KidsPeace could fulfill the behavioral and space requirements set out in the IEP. The Hearing Officer noted Mr. Anderson's participation at all three IEPT meetings in 2008 and found it telling. (Id. 617.) The Hearing Officer also considered input from Melissa Beckwith, who had personal knowledge related to other special education children located at KidsPeace, further demonstrating that the KidsPeace proposal offered an established service provider, not an unknown entity deserving a categorical rejection. It was not error for the Hearing Officer to accept this presentation as adequate assurance that KidsPeace was ready and able to supply the essential behavioral programming component for the 2008-2009 school year. In the Hearing Officer's words: "By offering KidsPeace as an alternative to a residential placement, the school department met its obligation to identify a placement where the student's program could most likely be implemented to allow the student to make demonstrable improvement in her areas of special needs."

Finally, Ms. Millay argues that the IEP is devoid of any meaningful deaf-blind curriculum and was inadequately developed because a deaf-blind expert was not involved throughout the entire process of developing the IEP. (Pl.'s Br. at 18.) As previously stated,

_____

[14] The merits of the placement decision made in the prior case was substantially influenced by the fact that Surry had not sufficiently arranged the KidsPeace placement by the start of the school year or offered the IEP team any input from KidsPeace itself.

Surry gathered a collection of qualified individuals to develop Y.M.'s IEP and transition plan in advance of the 2008-2009 school year and had appropriate goals and consultants lined up to deliver services in an appropriate environment.  It would not have been reasonable for the Hearing Officer to reject the work of so many qualified consultants simply because Dr. Bruce or someone else with her particular qualification was not involved from the start.  It is unfortunate that the pieces were not in place in time for the 2007-2008 school year, but they were in place in time for the 2008-2009 school year.  The Hearing Officer justifiably upheld the IEP based on the input of numerous qualified experts who were sage enough to develop an individualized program very reasonably calculated to provide Y.M. with a free appropriate public education, including a curriculum to be custom designed by a team of Ph.D.s and other consultants highly experienced in all of the relevant categories, including deaf-blind education modalities.

4.    *2008 ESY transition/reintegration plan*

Ms. Millay's opening brief argues that Surry was not prepared to implement the reintegration plan and suggests that there was some mystery whether Ms. York would actually serve as Y.M.'s special education teacher.  (Pl.'s Br. at 12, 23.)  The record as a whole more than adequately demonstrates that Ms. York was on hand (indeed, on hold), ready and willing to undertake her role in the program.  Ms. Millay may not have regarded Ms. York as up to standard, but Ms. York was a certified special education teacher who had committed to devoting all of her working day to Y.M., had participated in relevant background training offered by the Perkins School, and, in any event, was primarily to receive intensive training on the job from Dr. Bruce, Dr. Ferland, Dr. Pawletko, and other members of Y.M.'s team.  Surry sought to initiate the transition plan in the summer of 2008 so that, with cooperation from Ms. Millay, the extended gap in programming could come to an end with the 2008-2009 school year.  Given the

extended gap in services, it was not essential for the ESY program to prevent any further regression and it was fully appropriate to implement a transition plan that would gradually reintroduce Y.M. to a structured educational program. The consulting experts advised as much, and the Hearing Officer did not err in giving her blessing to this approach. Nor did the Hearing Officer err in finding that the failure to implement the transition plan was due to Ms. Millay's rejection of the same rather than timidity on the part of Ms. York or recalcitrance on the part of Surry administrators.

<em>5.	Miscellaneous procedural concerns</em>

The Hearing Officer addressed five specific procedural issues she identified in Millay's due process pleadings. Millay has not reintroduced all of these issues here and has, instead, worked some of them into her general presentation on the merits of Surry's IEP and placement decisions. The foregoing discussion addresses those issues satisfactorily, and in context. For the sake of completeness, it bears reiterating that "procedural flaws do not automatically render an IEP legally defective." <u>Roland M.</u>, 910 F.2d at 994. "Before an IEP is set aside, there must be some rational basis to believe that procedural inadequacies compromised the pupil's right to an appropriate education, seriously hampered the parents' opportunity to participate in the formulation process, or caused a deprivation of educational benefits." <u>Id.</u> The Hearing Officer fairly determined that the procedural plaints advanced by Millay did not give rise to a substantive shortcoming, for the reasons expressed by the Hearing Officer.

CONCLUSION

It would be mistaken to suggest that the foregoing discussion addresses every bone of contention that Ms. Millay has with the Surry School Department and the decisions it has made in connection with Y.M.'s special education programming. However, this discussion reviews the

Hearing Officer's essential findings and conclusions and, for the reasons set forth above, I

recommend that the Court affirm and uphold them both as a reasonable exercise of practical

judgment and as an exercise of educational expertise.  In the absence of a violation of the IDEA,

there is no basis for imposing any compensatory education remedy against Surry for the 2008

ESY period or the 2008-2009 school year.

### NOTICE

A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which *de novo* review by the district court is sought, together with a supporting memorandum, within fourteen (14) days of being served with a copy thereof.  A responsive memorandum shall be filed within fourteen (14) days after the filing of the objection.

Failure to file a timely objection shall constitute a waiver of the right to *de novo* review by the district court and to appeal the district court's order.

/s/ Margaret J. Kravchuk
U.S. Magistrate Judge

December 8, 2010